,

Natalie Camacho Mendoza ( ISB 4127)
CAMACHO MENDOZA LAW
P.O. Box 190438
Boise, ID 83719
natalie@camachomendozalaw.com

Mario Martinez (*pro hac vice*, CA SBN 200721)
Edgar Iván Aguilasocho (*pro hac vice*, CA SBN 285567)
MARTINEZ AGUILASOCHO & LYNCH, APLC
P.O. Box 1998
Bakersfield, CA 93303
info@farmworkerlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| CESAR MARTINEZ-RODRIGUEZ; DALIA ) PADILLA-LOPEZ; MAYRA MUÑOZ- ) LARA; BRENDA GASTELUM-SIERRA; ) LESLIE ORTIZ-GARCIA; and RICARDO ) NERI-CAMACHO, ) | Case No.  1:17-cv-0001-BLW |
| ) | **FIRST AMENDED COMPLAINT** |
| ) | |
| Plaintiffs, ) | **JURY TRIAL DEMANDED** |
| ) | |
| v. ) | |
| ) | |
| CURTIS GILES, an individual; and DAVID ) FUNK, an individual; the businesses they ) controlled and/or operated, including FUNK ) DAIRY, INC., an Idaho corporation; and ) SHOESOLE FARMS, INC., an Idaho ) corporation; and DOES 1 – 10, ) | |
| ) | |
| Defendants. ) | |

,

Cesar Martinez-Rodriguez, Dalia Padilla-Lopez, Mayra Muñoz-Lara, Brenda Gastelum-Sierra, Leslie Ortiz-Garcia, and Ricardo Neri-Camacho ("Plaintiffs"), by and through their undersigned attorneys, with personal knowledge as to themselves and their actions and otherwise on information and belief, hereby allege as follows:

## I.   PRELIMINARY STATEMENT

1. This civil action arises from a criminal conspiracy to bring Mexican nationals to the United States illegally for purposes of forced labor. Defendant Curtis Giles ("Giles") is at the center of this conspiracy, which involves the fraudulent recruitment of professional Mexican veterinarians for the purpose of evading U.S. immigration laws and hiring workers as low-wage, general laborers at Funk Dairy, Inc. Giles and his co-conspirators unlawfully lured Plaintiffs to the United States with false promises of professional work as animal scientists, but instead subjected them to long working hours under arduous conditions as general-labor dairy workers under threat of deportation if they displeased him. Defendants exploited Plaintiffs' fear, unfamiliarity with the American legal system, inability to speak English, and their immigration status for Defendants' illicit profit.

2. The Plaintiffs in this action are victims of human trafficking and were brought to the United to work for Defendants Funk Dairy, Inc. and Shoesole Farms, Inc., which are jointly owned and operated by Defendant David Funk and managed by Curtis Giles (hereinafter referred to as the "Defendants").

3. Human trafficking is a modern-day form of slavery, involving victims who are forced, defrauded, or coerced into labor exploitation, and sometimes sexual exploitation. Trafficking in human beings is reaching epidemic proportions throughout the world, including in the United States.[1] President George W. Bush called human trafficking "a special kind of evil" in

---

[1] In 2012, the International Labor Organization estimated that globally there were 14.2 million people trapped in forced labor in industries including agriculture, construction, domestic work and manufacturing. International Labor Organization, ILO GLOBAL ESTIMATE OF FORCED LABOUR (2012), http://www.ilo.org/wcmsp5/groups/public/---ed_norm/---

**FIRST AMENDED COMPLAINT**

the abuse and exploitation of the most innocent and vulnerable, and Congress, recognizing the countless human tragedies such practices inflict, passed the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), establishing a private cause of action for victims of human trafficking to ensure both the victims can be made whole and that the perpetrators of this inhuman practice are fully deterred from committing such acts in the future.

4.   Plaintiffs are Mexican veterinarians ("Médico Veterinario Zootécnistas" or "MVZ's"). Under false promises of professional-level employment as animal scientists, Defendants lured Plaintiffs into this country. Upon Plaintiffs' arrival in the United States in November and December 2014 and for the next several months, Plaintiffs were put to work as general laborers -- not as animal scientists -- and subjected to long grueling work days with abusive working conditions.

5.   Plaintiffs assert claims for damages under the Trafficking Victims Protection Act, 18 U.S.C. § 1589, *et seq.*; and state common law. Plaintiffs seek compensatory, declaratory, and injunctive relief against Defendants.

## II.   JURISDICTION

6.   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 18 U.S.C. § 1595(a) (civil trafficking).

7.   This Court has supplemental jurisdiction over the related state law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367. Supplemental

---

declaration/documents/publication/wcms_182004.pdf (last visited Nov 29, 2016). In a 2014 study from the Urban Institute of 122 closed cases of labor trafficking, seventy-one percent of the labor trafficking victims in the study entered the United States on lawful visas. Urban Institute, UNDERSTANDING THE ORGANIZATION, OPERATION, AND VICTIMIZATION PROCESS OF LABOR TRAFFICKING IN THE UNITED STATES (Oct 21, 2014), http://www.urban.org/research/publication/understanding-organization-operation-and-victimization-process-labor-trafficking-united-states/view/full_report (last visited Nov 29, 2016).

,

1    jurisdiction over those claims is appropriate because they arise from the same common

2    nucleus of operative facts from which the federal claims arise.

3  **8.**  Venue is proper in this court pursuant to 28 U.S.C. § 1391 because Defendants reside in this

4    district, and because a substantial part of the events and omissions giving rise to the claims

5    occurred in this District.

6  **III.   PARTIES**

7  **9.**  Plaintiffs Cesar Martinez-Rodriguez ("Martinez"), Dalia Padilla-Lopez ("Padilla"), Mayra

8    Muñoz-Lara ("Muñoz"), Brenda Gastelum-Sierra ("Gastelum"), Leslie Ortiz-Garcia

9    ("Ortiz"), and Ricardo Neri-Camacho ("Neri") are citizens of Mexico who were admitted to

10    the United States on a temporary basis by means of NAFTA Professional (TN) Visas to work

11    for the Defendants from approximately November 2014 to approximately November 2015.

12  **10.** Defendant FUNK DAIRY, INC. ("Funk Dairy") is a closely-held Idaho Corporation that

13    maintains its headquarters in Murtaugh, Idaho. Funk Dairy, Inc. is engaged in dairy

14    production in Twin Falls County, Idaho. Defendant Funk Dairy employed Plaintiffs as dairy

15    workers in the U.S. from on or about November 2014 to on or about November 2015.

16  **11.** Defendant SHOESOLE FARMS, INC. ("Shoesole Farms") is a closely-held Idaho

17    Corporation that maintains its headquarters in Hansen, Idaho. Shoesole Farms is engaged in

18    agricultural operations in Twin Falls County, Idaho. Defendant Shoesole Farms served as a

19    joint employer for Plaintiffs from on or about November 2014 to on or about November

20    2015.

21  **12.** Defendant DAVID FUNK ("Funk") is, and at all relevant times, was the Owner and

22    President of Funk Dairy, Inc. and Shoesole Farms, Inc.

23  **13.** Defendant CURTIS GILES ("Giles") is, and at all relevant times, was the Operations

24    Manager of Funk Dairy, Inc.

25

**14.** The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue Defendants by such fictitious names. Plaintiffs are informed and believe, and based thereon allege, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of the Defendants designated as DOE when the same are ascertained.

## IV.    GENERAL ALLEGATIONS AND FACTS

### A.  NAFTA TN Visas

**15.**  A TN Visa is a visa category within the North American Free Trade Agreement ("NAFTA"), and enables Canadian and Mexican citizens to enter the United States to engage in professional business activities on a temporary basis. The TN Visa was created after the signing of the North American Free Trade Agreement (NAFTA) in 1994 to facilitate the temporary movement of qualified professionals from Canada, Mexico and the United States.

**16.**  A citizen of a NAFTA country may qualify for a TN Visa and work in a professional occupation in the U.S. provided: (a) the profession is recognized under NAFTA; *and* (b) the alien possesses the specific criteria for that profession; *and* (c) the prospective position requires someone in that professional capacity; *and* (d) the alien is going to work for a U.S. employer. *See* 8 C.F.R. § 214.6.

**17.**  The employer in the U.S. must provide to the applicant a Letter of Employment in the United States. The letter must indicate that the position in question in the U.S. requires the employment of a person in a professional capacity, consistent with the NAFTA Chapter 16, Annex 1603, Appendix 1603.d.1. Appendix 1603.d.1 lists "Animal Scientist" as an appropriate professional-level position for purposes of the TN Visa application. *See* 8 C.F.R. § 214.6.

**18.** The Occupational Outlook Handbook (OOH) published by the U.S. Department of Labor provides general information about hundreds of occupations. The OOH category of Agricultural and Food Scientists includes jobs such as Animal Scientists, Food Scientists and Technologists, and Soil and Plant Scientists. The OOH describes an animal scientist as follows:

> "Animal scientists typically conduct research on domestic farm animals. With a focus on food production, they explore animal genetics, nutrition, reproduction, diseases, growth, and development. They work to develop efficient ways to produce and process meat, poultry, eggs, and milk. Animal scientists may crossbreed animals to get new combinations of desirable characteristics. They advise farmers on how to upgrade housing for animals, lower animal death rates, handle waste water, and increase production."

**B.  Recruitment by Funk Dairy, Inc.**

**19.**  Plaintiffs are informed and believe that on or about August 2014, Mexican attorney Mario Mercado Elizondo ("Mercado"), at the behest of Defendants, managed job ads in the job pools for the universities of UNAM (Universidad Nacional Autónoma de Mexico), UAA (Universidad Autónoma de Aguascalientes), and UAZ (Universidad Autónoma de Zacatecas). The job ads invited applicants to apply for positions with Funk Dairy, Inc. in Idaho. Additionally, Mercado placed job ads in the UNAM and UAA job pools for a company called Milk Source in Wisconsin.

**C.  Promises to UNAM Plaintiffs**

**20.**  On or about August 2014, Plaintiffs Brenda Gastelum-Sierra and Leslie Ortiz-Garcia ("UNAM Plaintiffs") contacted the UNAM job pool to arrange for interviews with Milk Source in Wisconsin. Mercado told the UNAM Plaintiffs that the jobs at Milk Source would be in positions requiring professional experience as veterinarians. Shortly afterward, on or

about August 2014, Mercado called the UNAM Plaintiffs and advised them that the positions with Milk Source were no longer available, but that similar professional-level positions were open with Funk Dairy, Inc. in Idaho. Mr. Mercado offered the UNAM Plaintiffs interviews with Funk Dairy, Inc., which the UNAM Plaintiffs accepted.

21.  On or about August 2014, Mario Mercado and Defendant Curtis Giles ("Giles") arrived at UNAM to conduct interviews with prospective candidates for employment at Funk Dairy, Inc. Defendant Giles speaks fluent Spanish. Defendant Giles gave a PowerPoint presentation to the full group of applicants. Defendant Giles then interviewed each of the candidates individually.

22.  Defendant Giles told the UNAM Plaintiffs that he only wanted candidates with professional veterinary experience. Giles promised the UNAM candidates employment at $10 per hour with the opportunity to earn higher wages after an undetermined period. Giles promised the UNAM Plaintiffs that Defendants would provide transportation to Plaintiffs to work in Idaho and living accommodations in Idaho. Giles also promised the UNAM Plaintiffs the following benefits after one year of employment: a $2,000 bonus, one week of paid vacation, and the cost of travel to return to Mexico. The UNAM Plaintiffs were led to believe by Defendants that the cost of travel to Idaho from Mexico would be paid for by Defendants.

23.  Defendant Giles told the UNAM Plaintiffs that his principal objective in contracting MVZ's was that the company, Defendant Funk Dairy, Inc., desired Plaintiffs to develop, implement, and oversee effective animal reproduction, nutrition, animal health, and related dairy industry programs with the university studies they had received. This is the reason they were contracting Plaintiffs with "Animal Scientist" Visas, which, under NAFTA, are considered "Professional (TN) Visas." Defendant told the UNAM Plaintiffs that they would rotate between the different work areas and choose the one that they preferred most. The UNAM Plaintiffs detrimentally relied on Defendant Giles' representations that Funk Dairy, Inc. was

recruiting them as "animal scientists" and would be helping them procure NAFTA Professional (TN) Visas in accepting the offered positions. The UNAM Plaintiffs were told they would be working as animal scientists, not general laborers.

24. On or about August 28, 2014, Plaintiff Ortiz sent an email to Giles asking for clarification as to the work arrangement. Specifically, Ms. Ortiz asked for clarification about the activities to be performed in her working area, working hours and shifts, and pay. On or about August 29, 2016, Giles responded in vague terms that she would be working in the "milking area" twelve hours per day and the opportunity to switch to different work areas would arise once she had received more experience. Defendant Giles did not tell Plaintiff Ortiz that he would not be performing veterinarian or animal scientist work; rather, he misled Plaintiff Ortiz.

**D. Promises to UAZ Plaintiffs**

25. On or about August 2014, Plaintiffs Dalia Padilla-Lopez, Mayra Muñoz-Lara, and Ricardo Neri-Camacho ("UAZ Plaintiffs") contacted the UAZ job pool to arrange for interviews with Funk Dairy, Inc. The UAZ Plaintiffs were told that the advertised job opening with Funk Dairy, Inc. would be in positions requiring professional experience as veterinarians.

26. On or about August 2014, after conducting interviews at UNAM, Mercado and Giles arrived at UAZ to conduct job interviews with prospective candidates. Giles used a lottery system to determine the order of candidates to be interviewed. Giles then interviewed each candidate individually.

27. Giles made the same promises and representations to the UAZ Plaintiffs that he had previously made to the UNAM Plaintiffs. Giles told the UAZ Plaintiffs that he only wanted candidates with professional veterinary experience. Giles promised the UAZ candidates employment at $10 per hour with the opportunity to earn higher wages after an undetermined period. Giles promised the UAZ Plaintiffs transportation to Idaho and living accommodations in Idaho. The UAZ Plaintiffs also understood Giles to mean that Defendants would be

providing transportation and living accommodations free of charge. Giles also promised the UAZ Plaintiffs the following benefits after one year of employment: a $2,000 bonus, one week of paid vacation, and the cost of travel to return to Mexico. The UAZ Plaintiffs also were led to believe by Defendants that the cost of travel to Idaho would be paid for by Defendants.

28.  Defendant Giles told the UAZ Plaintiffs that Funk Dairy, Inc.'s principal objective in contracting MVZ's was that the company desired Plaintiffs to develop, implement, and oversee effective animal reproduction, nutrition, animal health, and related dairy industry programs with the university studies they had received. Defendant Giles told the UAZ Plaintiffs that they would rotate between the different work areas and choose the one that they preferred most. The UAZ Plaintiffs detrimentally relied on Defendant Giles' representations that Funk Dairy, Inc. was recruiting them as "animal scientists" and would be helping them procure NAFTA Professional (TN) Visas in accepting the offered positions. The UAZ Plaintiffs were led to believe they would be working as animal scientists, not general laborers.

**E.  Promises to UAA Plaintiff**

29.  On or about July 2014, Plaintiff Cesar Martinez-Rodriguez ("UAA Plaintiff" or "Martinez") contacted the UAA job pool to arrange for an interview with Funk Dairy, Inc. Plaintiff Martinez was informed and believed that the advertised job opening with Funk Dairy, Inc. would be in a position requiring professional experience as a veterinarian.

30.  After having hired the UNAM and UAZ Plaintiffs, Giles traveled to meet with and interview UAA applicants in Aguascalientes, Mexico for the position of "Animal Scientist."

31.  Giles made the same promises and representations to the UAA Plaintiff that he had previously made to the UNAM and UAZ Plaintiffs. Giles told the UAA Plaintiff that he only wanted candidates with professional veterinary experience. Giles promised the UAA Plaintiff

employment at $10 per hour with the opportunity to earn higher wages after an undetermined period. Giles promised the UAA Plaintiff transportation to Idaho and living accommodations in Idaho. The UAA Plaintiff also understood Giles to mean that Defendants would be providing transportation and living accommodations free of charge. Giles also promised the UAA Plaintiff the following benefits after one year of employment: a $2,000 bonus, one week of paid vacation, and the cost of travel to return to Mexico. The UAA Plaintiff was also led to believe by Defendants that the cost of travel to Idaho would be paid for by Defendants.

**32.** Defendant Giles also told the UAA Plaintiff that Defendant Funk Dairy, Inc.'s principal objective in contracting MVZ's was that the company desired Plaintiff to develop, implement, and oversee effective animal reproduction, nutrition, animal health, and related dairy industry programs with the university studies he had received. This is the reason they were contracting Plaintiff with an "Animal Scientist" Visa. Defendant told the UAA Plaintiff that the employees being contracted would rotate between the different work areas and choose the one that they preferred most. The UAA Plaintiff detrimentally relied on Defendant Giles' representations that Funk Dairy, Inc. was recruiting him as an "animal scientists" and would be helping him procure a NAFTA Professional (TN) Visas in accepting the offered position. The UAA Plaintiff was led to believe he would be working as an animal scientist, not as a general laborer.

**F. TN Visa Interviews**

**33.** After hiring the UNAM, UAZ, and UAA Plaintiffs and prior to their travel to Idaho, Defendant Giles primarily communicated with Plaintiffs via email communications.

**34.** On or about September 29, 2014, Defendant Giles sent a questionnaire to Plaintiffs tailored to U.S. Department of State Form DS-160, a form used by the Department of State for processing Nonimmigrant Visas. In the DS-160 questionnaire, Plaintiffs wrote that Funk Dairy would be paying for their travel from Mexico to Idaho and that they intended to stay in

the United States for 3 years. On or about September 17, 2014, Defendant Giles sent an email to Plaintiffs stating that he had received all documents necessary to prepare Visa applications for Plaintiffs. On or about October 7, 2014, Defendant Giles confirmed that his attorney Jeremy Pittard had reviewed and approved those documents. Defendants did not ever communicate to Plaintiffs' that they would be working as general laborers instead of animal scientists, nor did Defendants state they would not be paying for transportation to Idaho or for housing there.  To the contrary, Defendants concealed these facts and misled Plaintiffs into believing they would be working as animal scientists and that their transportation to Idaho, and housing there, would be paid for by Defendants.

**35.** In an October 7, 2014 email, Defendant Giles requested times to speak telephonically with each individual Plaintiff to discuss their upcoming United States Embassy appointments, as well as travel to the United States.

**36.**  On or about October 10, 2014, Defendant Giles emailed Plaintiffs a sample letter containing the representations that they would be making to the United States Embassy in support of their TN Visa applications. The TN Visa application cover letters provided information about Funk Dairy, Inc. and the applicants, and described the nature of work that Plaintiffs intended to perform at Funk Dairy, Inc. that would qualify Plaintiffs for TN Visas. The letters stated in relevant part:

> "We are seeking to employ [Plaintiff] in the professional position of Animal Scientist to help develop, implement, and oversee effective animal reproduction, nutrition, animal health, and related dairy industry programs relating to effective herd management. Applying advanced theoretical and practical knowledge and skills in the field of animal science, he will be responsible for performing artificial insemination, sick/pregnant cow treatment, fresh cow monitoring, calving, colostrum handling, feed evaluation/ preparation, and related professional duties including monitoring milk cleanliness/

concentration and monitoring the transfer of antibodies in calf blood.  Due to the sophisticated, professional nature of the above duties, the person filling this position must hold at minimum a Bachelor's degree in Agricultural Science, Dairy Science, Veterinary Medicine, or a closely related field (please note that English language fluency is not required given the specific nature of the above duties and because the animal scientist will report to bilingual supervisory personnel on-site)."

**37.**  On or about the week of October 10, 2014, Defendant Giles, Mercado, and Attorney Pittard each individually spoke telephonically with each of the Plaintiffs to rehearse the interviews they would have with United States Embassy officials in support of their TN Visa applications. Each was told to specifically state that they were going to work at Funk Dairy as an "Animal Scientist." Defendants Giles and Attorney Pittard told Plaintiffs that if U.S. Department of State officials asked whether they would be performing general labor, such as milking cows or cleaning cow pens, that they should say no. Thereafter, Plaintiffs completed their United States Embassy interviews and responded to questions about the work arrangements based on the Defendants' job offer and description of the work arrangement. At the time of their U.S. Embassy interviews, Defendants had not provided Plaintiffs reason to believe that they would be working as anything other than Animal Scientists once they arrived to work for Defendants in Idaho.

**38.**  On or about October 30, 2014, Defendant Giles sent an email to Plaintiffs congratulating them regarding the approval of their visas and discussing their travel to Idaho.

**G.  Working Conditions**

**39.**  Plaintiffs Padilla, Muñoz, Ortiz, and Neri arrived in Idaho on or about November 2014. Plaintiffs Martinez and Gastelum arrived in Idaho on or about December 2014. Soon after arrival, Plaintiffs discovered that Defendants would not be honoring the various terms of their working agreement.

'

**40.**  Immediately upon commencing work at Funk Dairy, Defendants assigned Plaintiffs to work approximately nine to fourteen hour workdays as general laborers, six days per week. The work assignments that Defendants assigned Plaintiffs to perform included the following: milking cows, moving cows from one cow pen to another, assisting truck drivers with loading cattle to be sold, cleaning cow pens with shovels, cleaning animal waste from yards and cow pens, washing cow drinking basins, removing ice from water basins during the winter, collecting old wood from corrals, collecting garbage manually around the dairy, bringing food to feeding areas using tractors, maintaining salt licks, cleaning bottles and nipples, carrying cans of water and food to cows immobile due to illness, sweeping and cleaning veterinary areas, washing company vehicles, etc. On rare occasions, Plaintiffs performed minimal work in the birthing, veterinary, or artificial insemination areas, but this work was generally supervised by Defendants' staff veterinarians or supervisors and was routine labor with previously established step-by-step protocols.

**41.**  Defendants never provided Plaintiffs work as "Animal Scientists" as promised by Defendants, as described by the U.S. Department of Labor OOH or as described in Defendants' letter in support of their TN Visas, as they had been promised prior to travel from Mexico to the United States.

**42.**  Additionally, Plaintiffs' working space at Funk Dairy was highly unhygienic, even taking under consideration that it was an animal facility. Defendants did not provide a seated eating area for any of the Plaintiffs to eat lunch. When Plaintiffs worked in the milking area, they generally ate at their work station because Defendants did not permit them a meal period. When Plaintiffs worked in other areas, they generally used boxes or other materials to improvise a sitting area for their meals. These work and eating areas had flies and mice. Defendants only provided two portable toilets to be used for all dairy employees. There was one bathroom in the milking area that was normally kept locked; Plaintiffs Padilla, Muñoz,

Gastelum, and Ortiz had to ask Defendants several times before Defendants granted them permission to use this additional bathroom.

43.  Defendants never provided Plaintiffs protective equipment such as girdles for heavy lifting, rain boots, or protective lenses for working with corrosive materials such as chloric or acidic liquids.

44.  As a result of Defendants' failure to honor the work agreements, Plaintiffs Muñoz, Padilla, and Martinez sustained serious injuries while employed by Defendants. Plaintiff Muñoz suffered a severe injury on her index finger while milking cows and was brought to a doctor with a flesh-exposed finger, and although medical care was provided, Defendant did not ensure that she received the best possible medical treatment (e.g. reconstructive surgery). Defendants only provided Plaintiff Muñoz three weeks of temporary disability after a piece of her index finger was amputated. Plaintiff Padilla had her finger pressed and fractured on the job. Defendants did not permit her to take more than forty-eight hours of incapacity because they claimed that her other four fingers were enough for her to work. Plaintiff Martinez sustained a back injury caused by heavy lifting without proper equipment. Defendants only provided Plaintiff Martinez one month of physical therapy before refusing to pay for further treatment.

**H.  Housing and Transportation**

45.  Upon arrival in Idaho, Plaintiffs also discovered that Defendants would not be honoring their promises to provide adequate living conditions, transportation to work, or even the cost of travel to Idaho.

46.  Plaintiff Martinez was assigned to live in the basement of a home shared with other Funk Dairy employees. The basement had rats, spiders, and insects, with no lighting or heating, and without furniture. Plaintiffs arrived to work in Idaho during the winter, which meant that without a source for heating the basement was uninhabitable. As a result of the poor living

conditions, Plaintiff Martinez had to live and sleep on a sofa upstairs in the hallway of the home. Plaintiff Martinez complained to Giles about the living conditions on approximately four occasions over the span of several weeks, and Giles told him that the living conditions would improve. The living conditions did not improve until on or about April 2015, when Defendant finally provided Plaintiff Martinez with hospitable living conditions at a different home; however, at that time Giles unilaterally began charging Plaintiff Martinez $100 per month in rent, contrary to Giles' representation that housing would be provided free of charge.

47.  Defendants assigned Plaintiffs Dalia Padilla-Lopez ("Padilla"), Mayra Muñoz-Lara ("Muñoz"), Brenda Gastelum-Sierra ("Gastelum"), and Leslie Ortiz-Garcia ("Ortiz") to a shared home. Plaintiffs never signed a lease agreement for the home. Prior to travelling to Idaho, Defendants had represented to Plaintiffs Padilla, Muñoz, Gastelum, and Ortiz that housing would be provided to them without charge. The first month, Defendants did provide housing to these Plaintiffs for free. On the second month, Giles unilaterally began charging each of these four Plaintiffs $50 per person for rent. One month later, Giles unilaterally raised the rent to $100 per month. Finally, Defendant set the rent at $400 per month for the house, even after only Plaintiffs Gastelum and Padilla continued living there. The home was in poor condition, and even though Plaintiffs complained to Giles, Defendants never repaired the home. Eventually, Giles also asked Plaintiffs Gastelum and Padilla to pay a $600 deposit in addition to their monthly rent. Defendants deducted $300 directly from each Plaintiffs' paycheck. On or about November 2015, Giles also told Plaintiffs Gastelum and Padilla that he would be charging them for the previous year's gas bill. Defendants deducted approximately $170 directly from Plaintiff Padilla's paycheck and told her to ask the other Plaintiffs to pay their share directly to her.

,

**48.**  Defendants also kept Plaintiffs Padilla, Muñoz, Gastelum, and Ortiz under surveillance during their time living in the home. Giles told Plaintiffs that they could not receive male visitors and would confront Plaintiffs if vehicles of male co-workers were seen parked outside of the home. Defendants also kept copies of keys to the home, and would perform unannounced inspections without Plaintiffs' consent or permission.

**49.**  Defendants assigned Plaintiff Ricardo Neri-Camacho ("Neri") to a separate home that he shared with other dairy employees. Plaintiff Neri never signed a lease agreement with Defendants. Prior to travelling to Idaho, Plaintiff Neri was led to believe that housing would be provided to him without charge.  His first two months living in the company-provided housing, Defendants did not charge Plaintiff Neri rent. On the third month, Giles unilaterally began charging Plaintiff Neri $100 per month.

**50.**  Defendants also failed to honor their promise to provide transportation from Plaintiffs' homes to the worksite. Upon arrival in Idaho, Defendant Giles told Plaintiffs that they would need to find their own transportation to the dairy, either by acquiring vehicles or by asking co-workers for rides to work. Plaintiffs lived in a rural area with no access to public transportation. As a result of Defendants' failure to provide transportation, Plaintiffs incurred substantial expenses to acquire their own means of transportation, and Plaintiffs Martinez, Padilla, Muñoz, Ortiz, and Neri incurred the expense of purchasing vehicles.

**51.**  Defendants also failed to provide the cost of travel to and from Idaho. Mercado paid for Plaintiff Martinez's travel to Idaho from Mexico; however, upon arrival in Idaho, Defendant Giles told Plaintiff Martinez that the company would be deducting approximately $600 from his pay to cover those costs. Defendants did deduct those costs, without consent or authorization. The other Plaintiffs paid for their own travel to Idaho, which Defendants never reimbursed.

///

### I. Complaints to Defendant About Worker Agreement Violations

**52.** On or about January 4, 2015, Plaintiffs collectively sent an email to Mercado describing in detail their "red flag" complaints regarding their work at Funk Dairy. The letter detailed, in part, the following complaints. First, Plaintiffs complained that Defendants were assigning them to work long hours in general labor positions, which was contrary to the representations made by Giles as to the type of work they had been hired to perform, and contrary to the basis for the visa application. Second, Plaintiffs complained that Defendants did not provide them with rest or meal breaks. Third, Plaintiffs complained that Defendants were not providing adequate equipment for the heavy labor they were performing, resulting in significant strain on their backs. Fourth, Plaintiffs complained that Defendants were not providing appropriate equipment to ensure they could perform their work safely and sanitarily, such as gloves, boots, and protective eyewear. Fifth, Plaintiffs complained that Defendants were not providing them transportation to work as they had been promised. Sixth, Plaintiffs complained that Defendants were not providing them with no-cost living accommodations as had been promised, and that in the case of Plaintiff Martinez the living accommodations were uninhabitable. Seventh, Plaintiffs complained that Defendants had promised to cover the cost of air travel to the United States, but that ultimately they had failed to do so. Plaintiffs requested that Mercado speak to Defendants on their behalf to resolve these complaints.

**53.** On or about January 8, 2015, Mercado confirmed receipt of the complaints and promised to speak with Defendant Giles.

**54.** On or about January 12, 2015, Mercado confirmed that he had spoken with Giles regarding the complaints and told Plaintiffs the Defendant Giles would be seeking resolution.

**55.** Defendants never resolved the complaints that Plaintiffs detailed in the January 4, 2015 letter.

,

**J.  Threats of Abuse of the Law or Legal Process**

**56.**  Instead of resolving Plaintiffs' complaints about the violations of the work agreement, Defendant Giles on various occasions threatened Plaintiffs with abuse of the legal process by threatening to have them deported to Mexico if they displeased him.

**57.**  Within the first month of their arrival in Idaho, Defendant Giles obtained each Plaintiffs' passport. Plaintiffs are informed and believe that Defendant made photocopies of their passports before returning them.

**58.**  After obtaining copies of Plaintiffs' passports, Defendant Giles became aware that Plaintiffs were not satisfied with the work arrangement and were asking other non-guestworker Funk Dairy employees about their work arrangements and pay. On various occasions in 2014 and 2015, Defendant Giles told Plaintiffs that if they continued asking other Funk Dairy employees about their pay, that he would have them sent back to Mexico. On various occasions, Giles also told Plaintiff Ortiz that if she did not improve her work quality or he did not like her work quality in the milking area, he could send her back to Mexico.

**K.  Termination of Contract**

**59.** Defendants originally offered Plaintiffs positions as animal scientists for a period of three years and assisted Plaintiffs in receiving three-year TN Visas.

**60.** On or about November 2015, approximately one year after Plaintiffs received their TN Visas, Defendant Giles told Plaintiffs Martinez, Padilla, Muñoz, Gastelum, and Ortiz that he would terminating their contract. Defendants did not pay for the costs for Plaintiffs to leave Idaho and return to Mexico.

///

///

///

///

**18**
**FIRST AMENDED COMPLAINT**

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**(Trafficking Victims Protection Reauthorization Act, Forced Labor, 18 U.S.C. §§ 1589, 1595)**

(Against All Defendants)

61.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

62.  The Victims of Trafficking Protection Act, 22 U.S.C. § 7102, defines "severe forms of trafficking of persons" in relevant part as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

63.  The forced labor provision of the TVPRA, 18 U.S.C. § 1589, establishes: Whoever knowingly provides or obtains the labor or services of a person (1) by threats of serious harm to, or physical restraint against, that person or another person; (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or (3) by means of the abuse of law or the legal process, shall be fined or imprisoned not more than 20 years, or both.

64.  Defendants knowingly obtained Plaintiffs' services by (a) abusing the legal process through obtaining fraudulent NAFTA professional visas with no intention of providing professional work to Plaintiffs; and by (b) causing Plaintiffs to fear that they would be deported to Mexico for complaining about illegal working conditions and breach of contract, as Defendants had confiscated and made copies of Plaintiffs' passports.

**65.** Defendants knowingly obtained Plaintiffs' services by means of fraud and abuse or threatened abuse of the law or the legal process.

**66.** As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

**67.** Pursuant to 18 U.S.C. § 1595(a), which provides for civil damages for violations of § 1589, Plaintiff is entitled to recover damages and reasonable attorneys' fees for Defendants' wrongful conduct.

## SECOND CLAIM FOR RELIEF

**(Trafficking Victims Protection Reauthorization Act, Trafficking Into Servitude, 18 U.S.C. §§ 1590, 1595)**

(Against All Defendants)

**68.** Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**69.** The trafficking into servitude provision of the TVPRA, 18 U.S.C. § 1590, provides: recruiting, harboring, transporting, providing, or obtaining by any means any person for labor or services in violation of laws prohibiting peonage, slavery, involuntary servitude, or forced labor shall subject defendant to fines.

**70.** As set forth herein, Defendants knowingly recruited, harbored, transported, provided, and obtained Plaintiffs to provide general dairy labor and services to the Defendants, through fraud, deceit, and misrepresentation, knowing that Plaintiffs, who are professionals, would not knowingly agree to work as general laborers for a dairy. Defendants' conduct was done in violation of laws prohibiting forced labor.

**71.** Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

'

**72.**  Pursuant to 18 U.S.C. Section 1595(a), which provides for recovery of civil damages for violations of Section 1590, Plaintiffs are entitled to recover damages and reasonable attorneys' fees for Defendants' wrongful conduct.

### THIRD CLAIM FOR RELIEF

(Intentional Fraud)

(Against All Defendants)

**73.**  Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**74.** Defendants knowingly made false representations to Plaintiffs in or about the dates of August 2014 to December 2014 about their working arrangement in the United States, including, but not limited to, falsely informing Plaintiffs that Defendants would provide Plaintiffs with work as animal scientists, Defendants would provide reasonable travel and housing accommodations, Defendants would provide reasonable working conditions, and Defendants would pay for travel to and from the place of employment.

**75.**  Defendants had knowledge of the falsity of their misrepresentations at the time those misrepresentations were made. The truth was that Defendants never intended to provide Plaintiffs with work as animal scientists, provide reasonable travel and housing accommodations, pay for Plaintiffs' cost to travel to the United States, or provide reasonable working conditions.

**76.**  Defendants made the representations with the intent to defraud and induce Plaintiff to come to the United States. Defendants intended for Plaintiff to rely on their false statement and misrepresentations. Plaintiffs justifiably relied on Defendants' misrepresentations in deciding to leave their life in Mexico and emigrate to the United States.

**77.** Defendants made these false representations to Plaintiffs in order to induce them to leave their home and life in Mexico and move to the United States where they would be employed by Defendants.

**78.** Defendants submitted false NAFTA Professional Visa Applications to the U.S. Department of State, with full knowledge that Defendants were never going to employ Plaintiffs as Animal Scientists, but rather sought to employ them as general laborers. Defendants even made sure to "prepare" Plaintiffs for their State Department interviews to ensure they said they would be employed as Animal Scientists, when in fact, they had no intention of providing Animal Scientist work to Plaintiffs.

**79.** Plaintiffs were injured as a result of their justifiable reliance on Defendants' false statements and misrepresentations, which caused them to leave their home, subjected them to exploitation of their labor, and caused them to suffer damages. Plaintiffs are entitled to damages in an amount to be proven at trial.

**80.** Defendants committed the acts alleged in this Complaint with the wrongful intention of injuring Plaintiffs. Defendants' improper motive amounted to malice, in conscious disregard of Plaintiffs' rights. Because Defendants acted with full knowledge of the consequences to the Plaintiff as alleged in this Complaint, with the intent to violate the statutory and other employment rights of Plaintiffs, as well as immigration laws, and/or with a willful, conscious, wanton, malicious and oppressive disregard for Plaintiffs' rights and for the deleterious consequences and cruel and unjust hardship resulting to Plaintiffs, Plaintiffs are entitled to exemplary and punitive damages in an amount to be proven at trial.

///

///

///

///

'

## FOURTH CLAIM FOR RELIEF

### (Concealment)

### (Against All Defendants)

81.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

82.  Defendants concealed from Plaintiffs material facts related to their employment and living arrangements while in the United States, including, but not limited to, requiring an excessive and grueling work schedule performing work as general laborers instead of animal scientists, providing inadequate room and board, and failing to provide transportation to the worksite pursuant to their established work agreement.

83.  Defendants entered into an employment contract with Plaintiffs and as Plaintiffs' employers were under a duty to inform them of material facts related to their employment. Defendants intentionally concealed these material facts because they intended to defraud Plaintiffs into entering into the employment relationships.

84.  Plaintiffs were unaware of the concealed facts. Had Plaintiffs known of the concealed facts, they would not have entered into the employment relationship with Defendants.

85.  Plaintiffs were injured as a result of the concealment, which caused them to leave their home, cause them to suffer labor exploitation, and caused them to suffer physical damages. Plaintiffs are entitled to damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (False Promise)

### (Against All Defendants)

86.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

,

**87.** While in Mexico, Defendants falsely promised Plaintiffs that they would be provided employment as professional animal scientists, a suitable working environment, costs of travel, and comfortable living accommodations. At the time the promises were made, Defendants had no intention of performing them.

**88.** Defendants made these promise with the intent to fraudulently induce Plaintiffs to come to the United States and enter into an employment contract, while never intending to provide what was promised.

**89.** Plaintiffs were injured as a result of their justifiable reliance on Defendants' false promises, which caused them to leave their home, be subjected to labor exploitation, and caused them to suffer physical damages. Plaintiffs are entitled to damages in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**

(Negligent Misrepresentation)

(Against All Defendants)

**90.** Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**91.** Defendants made false representations to Plaintiffs in or about August 2014 to December 2014 about the circumstances of their emigration to the United States.

**92.** Defendants had no reasonable grounds for believing their representations to be true.

**93.** Defendants intended for Plaintiffs to rely on their false statements and misrepresentations. Plaintiffs justifiably relied on Defendants' misrepresentations in deciding to leave their home and life in Mexico and emigrate to the United States.

**94.** Plaintiffs were unaware of Defendants' true intentions, and had they been aware of such facts, would not have left their home to come to the United States with Defendants.

**24**
**FIRST AMENDED COMPLAINT**

,

**95.**  Plaintiffs were injured as a result of their reliance on Defendants' false statements and misrepresentations, which cause them to leave their home, subjected them to exploitation of their labor, and caused them to suffer damages. Plaintiffs are entitled to damages in an amount to be proven at trial.

**SEVENTH CLAIM FOR RELIEF**

(Breach of Contract)

(Against All Defendants)

**96.**  Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**97.**  Defendants and Plaintiffs agreed orally and via documentary evidence produced during the TN Visa application process that Plaintiffs would be working as animal scientists, would be fairly compensated, would be provided reasonable travel and housing accommodations at no cost to themselves, would be reimbursed for the cost of travel from Mexico to Idaho, and would have reasonable working conditions.

**98.**  Plaintiffs have duly performed each and every condition, covenant, and promise and obligation required on their part in accordance with the terms and conditions of their contract.

**99.**  Defendants breached their contract with Plaintiff by not providing Plaintiffs with work as animal scientists, by instead assigning them to general labor positions, by failing to provide them reasonable housing and travel accommodations at no cost to themselves, by not providing or reimbursing Plaintiffs for the cost of travel from Mexico to Idaho, and by otherwise not fulfilling the terms required under the contract.

**100.**   As a result of Defendants' breach of contract, Plaintiffs have suffered damages in an amount to be determined at trial.

///

**25**
**FIRST AMENDED COMPLAINT**

### EIGHTH CLAIM FOR RELIEF

(Breach of the Covenant of Good Faith and Fair Dealing)

(Against All Defendants)

**101.** Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

**102.** The contract between Plaintiffs and Defendants contained, by implication of law, a covenant of good faith and fair dealing. Defendants covenanted that they would not do anything in the performance or enforcement of the contract to impair or frustrate the right of Plaintiffs to receive the benefits they had been promised.

**103.** By willfully failing to perform under this contract and by threatening to retaliate against Plaintiffs when they attempted to enforce the terms of the contract, Defendants breached the implied covenant of good faith and fair dealing.

**104.** As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs have been wrongfully denied the benefits of their contracts and have sustained damages in an amount to be proven at trial.

### V.   JURY TRIAL DEMAND

**105.** Plaintiffs hereby demand a jury trial on all issues so triable.

### VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgement or issue an order against Defendants, and each of them, as follows:

1. Declaratory and injunctive relief;

2. Compensatory damages;

3. Punitive damages;

4. An award of prevailing party costs, including attorney fees; and

5. Such other relief as the Court deems just and appropriate.

Dated:  October 16, 2017          CAMACHO MENDOZA LAW


                                  _____
                                  NATALIE CAMACHO MENDOZA
                                  Attorneys for Plaintiffs


Dated: October 16, 2017           MARTINEZ AGUILASOCHO & LYNCH, APLC


                                  _____
                                  EDGAR IVAN AGUILASOCHO
                                  MARIO MARTINEZ
                                  Attorneys for Plaintiffs