Mario Martínez (*pro hac vice*, CA SBN 200721)
Edgar Iván Aguilasocho (*pro hac vice*, CA SBN 285567)
MARTINEZ AGUILASOCHO & LYNCH, APLC
P.O. Box 1998
Bakersfield, CA 93301
Telephone:     (661) 859-1174
Facsimile:      (661) 859-6154
E-mail:         info@farmworkerlaw.com

Natalie Camacho Mendoza (ISB 4127)
CAMACHO MENDOZA LAW
P.O. Box 190438
Boise, ID 83719
E-mail:         natalie@camachomendozalaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CESAR MARTINEZ-RODRIGUEZ, DALIA PADILLA-LOPEZ, MAYRA MUNOZ-LARA, BRENDA GASTELUM-SIERRA, LESLIE ORTIZ-GARCIA, and RICARDO NERI-CAMACHO,<br><br>Plaintiffs,<br><br>v.<br><br>CURTIS GILES, an individual, DAVID FUNK, an individual, FUNK DAIRY, INC., an Idaho corporation, SHOESOLE FARMS, INC., an Idaho corporation, and JOHN DOES 1-10,<br><br>Defendants. | Case No.: 1:17-cv-00001-DCN<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 35)** |

Plaintiffs Cesar Martinez-Rodriguez, Dalia Padilla-Lopez, Mayra Munoz-Lara, Brenda Gastelum-Sierra, Leslie Ortiz-Garcia, and Ricardo Neri-Camacho ("Plaintiffs"), by and through their attorneys of record, and, pursuant to Federal Rules of Civil Procedure 7 and 56 and District Local Rule of Civil Procedure 7.1, hereby respectfully oppose *Defendants' Motion for Summary Judgment*, Dkt. 35. In support of this opposition, Plaintiffs submit the following: their *Memorandum in Support of Plaintiffs' Opposition to Motion for Summary Judgement*; *Plaintiffs' Response to Defendants' Statement of Facts in Support of Defendants' Motion for Summary Judgment (Dkt. 35-1) and Plaintiffs' Statement of Material Facts in Dispute*; and the *Affidavit of Edgar Ivan Aguilasocho*.

Dated: October 17, 2018                Respectfully submitted,

                                        MARTINEZ AGUILASOCHO & LYNCH, APLC


                                        /s/ Edgar Ivan Aguilasocho_____
                                        Edgar Iván Aguilasocho, Esq.
                                        Attorney for Plaintiffs

Mario Martínez (*pro hac vice*, CA SBN 200721)
Edgar Iván Aguilasocho (*pro hac vice*, CA SBN 285567)
MARTINEZ AGUILASOCHO & LYNCH, APLC
P.O. Box 1998
Bakersfield, CA 93301
Telephone:   (661) 859-1174
Facsimile:   (661) 859-6154
E-mail:      info@farmworkerlaw.com

Natalie Camacho Mendoza (ISB 4127)
CAMACHO MENDOZA LAW
P.O. Box 190438
Boise, ID 83719
E-mail:      natalie@camachomendozalaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CESAR MARTINEZ-RODRIGUEZ, DALIA PADILLA-LOPEZ, MAYRA MUNOZ-LARA, BRENDA GASTELUM-SIERRA, LESLIE ORTIZ-GARCIA, and RICARDO NERI-CAMACHO,<br><br>Plaintiffs,<br><br>    v.<br><br>CURTIS GILES, an individual, DAVID FUNK, an individual, FUNK DAIRY, INC., an Idaho corporation, SHOESOLE FARMS, INC., an Idaho corporation, and JOHN DOES 1-10,<br><br>Defendants. | Case No.: 1:17-cv-00001-DCN<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 35)** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES

I.      INTRODUCTION ................................................................1

II.     STATEMENT OF THE ISSUES, FACTS &
        PROCEDURAL HISTORY ......................................2

III.    STANDARD OF REVIEW ...........................................2

IV.     ARGUMENT ....................................................................3

    A.  Summary judgment is not proper because
        Defendants fail to demonstrate an absence
        of genuine dispute regarding material facts
        in this case. ....................................................................3

    B.  Defendants are not entitled to summary
        judgment as there is a genuine dispute as
        to whether they violated Federal anti-trafficking
        laws. ..............................................................................4

        a.  Defendants deny material facts showing
            they committed forced labor. ..............................4

            1.  Whether Defendants knowingly
                provided or obtained labor. ........................5

            2.  Whether Defendants obtained
                and retained Plaintiffs' labor by
                threatening serious harm, abusing
                the legal process, and creating a
                scheme to control Plaintiffs. ....................6

            3.  Whether Defendants used those
                means intending Plaintiffs to believe
                they had no choice but to keep working. ....8

        b.  Defendants also deny they committed
            Trafficking into servitude. ..............................11

    C.  The Court has proper subject matter jurisdiction
        over Plaintiffs' claims. ..............................................11

    D.  Defendants are not entitled to summary judgment

because there is a genuine dispute whether they
committed common law violations against Plaintiffs. .................................12

    a.  Defendants deny material facts regarding the
       fraud-based claims. ..................................................................12

    b.  There are genuine disputed issues of material
       fact regarding Plaintiffs' claim for negligent
       misrepresentation. ..................................................................14

    c.  Defendants deny material facts regarding
       Plaintiffs' contract claims. ......................................................14

    d.  Defendants deny material facts regarding
       Plaintiffs' damages. ................................................................17

E.  Moreover, the record demonstrates that all four
    Defendants are liable for Plaintiffs' damages,
    including Defendants Funk, Giles, and Shoesole Farms. ...........................18

V.     CONCLUSION ....................................................................................20

# TABLE OF AUTHORITIES

## SUPREME COURT CASES

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................................2

## SEVENTH CIRCUIT COURT CASES

*United States v. Calimlim*,
538 F.3d 706 (7th Cir. 2008)......................................................................................5

## NINTH CIRCUIT COURT CASES

*Bauman v. DaimlerChrysler Corp.*,
644 F.3d 909 (9th Cir. 2011).....................................................................................18

*Doe v. Unocal Corp.*,
248 F.3d 915 (9th Cir. 2001).....................................................................................18

*Ditullio v. Boehm*,
662 F.3d 1091 (9th Cir. 2011)...................................................................................18

*Headley v. Church of Scientology Int'l*,
687 F.3d 1173 (9th Cir. 2012).....................................................................................5

*T.W. Electrical Serv., Inc. v. Pac. Electrical Contractors Assoc.*,
809 F.2d 626 (9th Cir. 1987).......................................................................................3

*United States v. Bonds*,
608 F.3d 495 (9th Cir. 2010).....................................................................................20

*United States v. Dann*,
652 F.3d 1160 (9th Cir. 2011)..............................................................................4, 5, 8

## TENTH CIRCUIT COURT CASES

*United States v. Kalu*,
791 F.3d 1194 (10th Cir. 2015).....................................................................................8

## DISTRICT COURT CASES

*Aguirre v. Best Care Agency, Inc.*,
961 F. Supp. 2d 427 (E.D.N.Y. 2013)...............................................................*PASSIM*

*Lagayan v. Oden*,
199 F. Supp. 3d 21 (D.C. Dist. 2016) ................................................................ 11

*Ruiz v. Fernandez*,
949 F. Supp. 2d 1055 (E.D. Wash. 2013) ............................................................ 9

**STATE CASES**

*Aaradema v. United States Dairy Sys.*,
215 P.3d 505 (Idaho 2009) ................................................................................. 14

*County Cove Dev., Inc. v. May*,
150 P.3d 288 (Idaho 2006) ................................................................................. 12

*G&M Farms v. Funk Irrigation Co.*,
808 P.2d 851 (Idaho 1991) ................................................................................. 12

*Indep. Lead Mines Co. v. Hecla Mining Co.*,
137 P.3d 409 (Idaho 2006) ................................................................................. 15

*Jenkins v. Boise Cascade Corp.*,
108 P.3d 380 (Idaho 2005) ............................................................................. 15, 16

*Lunneborg v. My Fun Life*,
421 P.3d 187 (Idaho 2018) ................................................................................. 19

*Metcalf v. Intermountain Gas Co.*,
778 P.2d 744 (Idaho 1989) ................................................................................. 16

*O'Neal v. Stifel, Nicolaus & Co.*,
996 S.W.2d 700 (E.D. Mo. 1999) ....................................................................... 12

*People of the State of California v. Efren Alvarez*,
No. F16902732, Superior Court of California, County of
Fresno (trial held Aug. 13–31, 2018) .............................................................. 1, 10

*Soria v. Sierra Pac. Airlines, Inc.*,
726 P.2d 706 (Idaho 1986) ................................................................................. 18

**STATUTES**

18 U.S.C. § 1589 .................................................................................................. 4

18 U.S.C. § 1590 ................................................................................................. 11

18 U.S.C. § 1595 .................................................................................................4, 18

22 U.S.C. §§ 7101–7114 ...........................................................................................4

28 U.S.C. § 1331 .....................................................................................................11

28 U.S.C. § 1332 .....................................................................................................12

28 U.S.C. § 1367 .....................................................................................................11

**FEDERAL COURT RULES**

Fed. R. Civ. P. 12(h) ...........................................................................................2, 18

Fed. R. Civ. P. 56(a) .................................................................................................2

**DISTRICT COURT RULES**

Dist. Loc. R. Civ. P. 7.1(c) .......................................................................................2

**RESTATEMENTS**

Restatement (Second) of Torts § 552(1) .................................................................14

Restatement (Third) of Agency § 7.01 ...................................................................20

## I.     INTRODUCTION

Defendants' *Motion for Summary Judgment*, Dkt. 35 should be denied because, at a minimum, there is a genuine dispute of material facts, as shown by documents filed herewith. Further, Defendants committed unlawful acts against Plaintiffs during their recruitment, employment, and termination in violation of Federal anti-trafficking laws and Idaho common law, as explained *infra*. Defendants improperly used the guest worker program under The North American Free Trade Agreement ("NAFTA") to hire Plaintiffs with TN Visas for professional-level work as animal scientists at their dairy farm, but instead assigned them to menial, unskilled work. Yet, this case entails more than a mere labor dispute. Simply stated, Defendants' summary judgment motion misrepresents the legal theory underlying Plaintiffs' claims.

Plaintiffs present a pioneer case. To date, few labor trafficking cases have been filed nationwide, and even fewer in the agricultural context. To the best of our knowledge, this is the first case of its kind filed in the U.S. District Court of Idaho; yet, it is not the first that counsel for Plaintiffs has handled. Just this past August, Plaintiffs' counsel acted as Victims' Rights counsel and successfully assisted the California Fresno County District Attorney's Office in obtaining a guilty verdict for forced farmworker labor in *People v. Alvarez*.[1] Although *Alvarez* was a criminal case, the facts of the present case are more egregious than those in *Alvarez*, as discussed *infra*, while the standard of proof is less demanding.

---

[1] *People of the State of California v. Efren Alvarez*, No. F16902732. The sentencing hearing is October 29, 2018, and Alvarez faces a prison sentence of up to fifteen (15) years. Pablo Lopez, *Prosecutors Rack up Fresno County's First Ever Human Labor Trafficking Conviction*, FRESNO BEE (Aug. 31, 2018, 5:07 PM), https://www.fresnobee.com/news/local/crime/article217677925.html.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Further, Defendants fail to establish that there is no dispute as to material facts. On each key element of the forced labor claims, Plaintiffs and Defendants disagree as to what transpired. Plaintiffs allege that Defendants induced their labor through fraud and threats of deportation. Defendants deny that they committed fraud and deny that they issued threats of deportation. On this basis alone, because there are material factual disputes, the *Motion* should be denied.

## II.    STATEMENT OF THE ISSUES, FACTS & PROCEDURAL HISTORY

In accordance with District Local Rule of Civil Procedure 7.1, subdivision (c), Plaintiffs have filed herewith a separate statement responding to Defendants' factual statements and additionally stating material facts in dispute. Plaintiffs are in general agreement with the procedural history of this case as stated in Defendants' *Memorandum in Support of Defendants' Motion for Summary Judgment*, Dkt. 36-1. Plaintiffs dispute all other material factual claims, as discussed in the accompanying filing.

## III.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party is 'entitled to judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party has the initial burden of proving an absence of material facts in dispute. *Id.* Once met, the burden shifts to the nonmoving party to prove a genuinely disputed fact, using materials in the record, including depositions, documents, and affidavits. *Id.* at 324.

> A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the substantive law governing the claim or defense. . . . The issue of material fact required by Rule 56(c) to be present to entitle a party to

proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. . . . Therefore, at summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.

*T.W. Electrical Serv., Inc. v. Pac. Electrical Contractors Assoc.*, 809 F.2d 626, 630–31 (9th Cir. 1987) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).

### IV.   ARGUMENT

#### A.  Summary judgment is not proper as Defendants fail to demonstrate an absence of genuine dispute regarding material facts in this case.

Materials from the record reveal there are material facts in dispute, as referenced in documents filed herewith. Even where both parties have presented conflicting direct evidence, the Court must consider all facts in a light most favorable to Plaintiffs. In doing so, the Court will find Defendants simply are not entitled to judgment as a matter of law as there are credibility issues regarding material facts that go to essential elements of Plaintiffs' claims.

In the instant case, Defendants and Plaintiffs disagree on the most central facts of this forced labor case. Defendants deny fraudulently inducing Plaintiffs to leave Mexico to work for them in Idaho and deny committing visa fraud in the process. Defendants deny breaching the terms of their agreement with Plaintiffs once they arrived in the United States by requiring Plaintiffs to perform non-professional work. Plaintiffs further deny threatening to deport Plaintiffs. These are the central material facts in this case, and a jury must decide the ultimate veracity of the parties' claims, based on witness testimony and credibility determinations. Therefore, summary judgment should be denied in its entirety because Defendants have failed to meet their burden of showing there is no genuine dispute as to material facts.

**B. Defendants are not entitled to summary judgment because there is a genuine dispute as to whether they violated Federal anti-trafficking laws.**

Recognizing human trafficking as a modern-day form of slavery, Congress enacted the Trafficking Victims Protection Act ("TVPA"), 22 U.S.C. §§ 7101–7114, which added trafficking offenses to Title 18, Chapter 77 of the United States Code. In 2003, Congress enacted the Trafficking Victims Protection Reauthorization Act ("TVPRA"), establishing a private cause of action for trafficking victims against perpetrators for Chapter 77 offenses. 18 U.S.C. § 1595.

**a. Defendants deny material facts showing they committed forced labor.**

The TVPRA defines forced labor as:

> knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means—
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a). In sum, there are three (3) elements: an act, a means, and a purpose. The TVPRA also defines "serious harm" as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

*Id.* at § 1589(c)(2). An individual "is guilty of forced labor if he intends to cause a person to believe that if she does not work, she will suffer . . . serious harm[.]" *United States v. Dann*, 652 F.3d 1160, 1169–1170 (9th Cir. 2011). "[T]he threat [is] considered from the vantage point of a reasonable person in the place of the victim [and] must be 'sufficiently serious' to compel that

person to remain." *Id.* at 1170. Overt of subtle threats of financial, reputational, and/or immigration harm can suffice. *Id.* at 1172 (finding serious harm where employer repeatedly threatened to return immigrant employee back home, though "never explicitly threaten[ing] deportation"); *see United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008) (finding warnings of legit immigration consequences can support a claim for forced labor); *see Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 445–46 (E.D.N.Y. 2013) (finding "disputed material issues of fact as to whether Defendants abused the law or legal process," thus denying summary judgment). "In applying the Act, [courts] must distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences." *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (citations omitted).

### 1. Whether Defendants knowingly provided or obtained labor.

Defendant Curtis Giles ("Giles") knowingly provided Plaintiffs' labor for Defendants David Funk ("Funk"), Funk Dairy, and Shoesole Farms, who thus knowingly obtained that labor. Ex. 26, at 36–46. After an investigation by U.S. Immigrations and Customs Enforcement ("ICE") forced Defendants to terminate the majority of Funk Dairy's workforce, and failing to hire domestic workers, Defendants inquired into the NAFTA work program under which foreigners have authorization to work in the U.S. for up to three years. Ex. 5, at 4, 6; Ex. 26, at 27–36. With Funk's approval, Giles made arrangements to recruit college graduated veterinarians and animal scientists from Mexican universities using NAFTA TN Visas, giving PowerPoint presentations to, and conducting one-on-one interviews with qualified candidates. Ex. 26, at 36–46. Defendants offered Plaintiffs the following employment terms: professional-level work as animal scientists for three years, maximum twelve hour shifts per day, six days per week, starting at $10 per hour with guaranteed opportunities to earn raises, a minimum annual salary of $25,000, free

airfare to Idaho, housing, childcare, and transportation to and from work, and, after one year, return airfare to Mexico, one week paid vacation, and a $2,000 bonus. Ex. 4; Ex. 19, at 34–35; Ex. 22, at 23–25, 42; Ex. 23, at 36; Ex. 24, at 31–36. On that basis, Plaintiffs accepted the offer.

### 2.   Whether Defendants obtained and retained Plaintiffs' labor by threatening serious harm, abusing the legal process, and creating a scheme to control Plaintiffs.

Defendants threatened Plaintiffs with immigration harm. From the start of employment, Defendants threatened to fire Plaintiffs if they discussed their salary with others or complained about their dissatisfaction with work assignments. Ex. 23, at 68–69; Ex. 22, at 59; Ex. 24, at 78. Plaintiffs understood that if they were fired, their visas would expire and they would be subject to deportation. Ex. 19, at 42–43; Ex. 22, at 31. However, Defendants' warnings were illegal, as evidenced by the repeated and unreasonable nature of their statements. Indeed, on multiple occasions Defendants threatened to return Plaintiffs to Mexico, even threatening to send them home without their belongings. Ex. 23, at 68–69. These were impermissible threats that would impose serious immigration consequences for Plaintiffs.

Defendants also threatened Plaintiffs with financial harm. Plaintiffs depended on Defendants for the costs of travel. At least one Plaintiff had to sell her belongings and take out a loan to purchase a plane ticket to travel to Idaho for work. Ex. 24, at 33–34. Also, Defendants helped Plaintiff Martinez travel to Idaho for work by purchasing his plane only to later, to his surprise and without his authorization, deduct that expense from his pay. Ex. 21, at 36. The others had relied on Defendants' promises to reimburse them for travel costs, but Defendants never fulfilled that promise. Ex. 24, at 33. Similarly, Defendants promised that after one year of work, they would cover the costs of return travel to Mexico and would provide a $2,000 bonus and one week of paid vacation. *Id.* So, despite their frustrations with working conditions,

Plaintiffs continued to work for Defendants in hopes of obtaining means to return home and some reward for their hard work, although in the end, Defendants did not fulfill their promises. Ex. 21, at 35–36. Only Plaintiff Neri quit before obtaining the $2,000 bonus he could use to return home, but only because it was imperative to his health. Ex. 20, at 65–66.

Further, Defendants created and imposed a scheme to control Plaintiffs and prevent them from leaving employment, including by making regular threats of deportation discussed *supra*. Additionally, Defendants controlled Plaintiffs by setting them up to live in Defendant-owned dairy housing, maintaining constant surveillance on those houses, and prohibiting the female Plaintiffs from receiving visitors, including the male Plaintiffs who were the only other people in Idaho whom Plaintiffs knew. Ex. 23, at 70, 73–75. Defendants would "have somebody watching [them] constantly, and if they saw any cars that were not the normal cars [they] were using, they would report it to" Giles, who would then reprimand the visitors that also worked for Defendants, thus isolating Plaintiffs from the rest of the world. *Id.* Rather than allow Plaintiffs comfort and companionship in a foreign place, Defendants made Plaintiffs feel monitored, fearful, and alone. Plaintiffs understood that the housing was tied to their employment because Defendants "told [them] that if [they] left [their] job, [they would] had to immediately leave the house[.]" Ex. 24, at 56. Only when they had finally saved up enough to afford housing elsewhere did Plaintiffs move. Ex. 19, at 42.

Even if they had wanted to return to Mexico, Defendants strategically imposed financial constraints on them by fraudulently offering to cover various costs and then failing to fulfill those promises, which meant Plaintiffs had to continue working to make ends meet. *Id.*; Ex. 21, at 35–36. Even by Defendants' own calculations in a PowerPoint presentation notably modified after recruiting Plaintiffs, others in their situation could expect to take home very little after

expenses. Ex. 1, at 16; Ex. 19, at 35–36. Defendants further controlled Plaintiffs by limiting their means of travel. When Plaintiffs agreed to work for Defendants, they believed Defendants would provide them with transport. When Defendants failed to do that, Plaintiffs had to rely on coworkers for rides or else walk until they were finally able to pool their money together and purchase their own vehicles. Ex. 20, at 36; Ex. 23, at 23.

Moreover, Defendants did not provide Plaintiffs with opportunities for breaks, forcing them to work nonstop for twelve hours, which had serious health implications especially for Plaintiff Neri, whom Defendants knew suffered from diabetes. Ex. 20, at 26, 66. Defendants also denied Plaintiffs regular access to bathrooms during work, and sometimes their only option was to urinate in a bucket. Ex. 24, at 55. Despite frequent workplace injuries, Defendants limited access to proper medical care. Ex. 19, at 26; Ex. 21, at 50–51; Ex. 22, at 53–57; Ex. 23, at 77. For example, after a hydraulic bar cut off one of Plaintiff Munoz's fingertips, Defendants delayed her transport to the hospital by over an hour after which the fingertip could no longer be attached, and to this day she is missing part of her finger. Ex. 19, at 19–22. In Plaintiff Padilla's case, when she fractured her finger at work, Defendants denied her time-off to recover, telling her she "had nine other fingers[.]" Ex. 22, at 54–57.

### 3.   Whether Defendants used those means intending Plaintiffs to believe they had no other choice but to keep working.

A person's means of coercion is sufficient so long as it is enough to compel another to provide labor and the defendant intended to cause that effect. *United States v. Dann*, 652 F.3d 1160, 1170–72 (9th Cir. 2011) (finding evidence of employer's intent where employer threatened to return victim to Peru and that victim would owe money if she left); *see also United States v. Kalu*, 791 F.3d 1194, 1199, 1211–12 (10th Cir. 2015) (affirming jury finding of forced labor where employer's scheme "relied on a number of fraudulent misrepresentations that allowed him

to bring []nurses to the United States [under a specialized guest worker visa], keep them in the country, and profit from their labor"); *see also Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1077 (E.D. Wash. 2013) (denying summary judgment on forced labor claim because jury could find employer's threats of deportation were intended to coerce labor).

Defendants intended to compel Plaintiffs to work under threats of serious harm and a scheme to control, monitor, isolate, and restrict Plaintiffs. Defendants submitted letters to the U.S. Embassy in support of Plaintiffs' visa applications, specifically stating they sought "to employ [Plaintiffs] in the professional-level position of Animal Scientist" whereby they would "[a]pply[] advanced theoretical and practical knowledge and skills" and which entailed duties of a "sophisticated, professional nature[.]" Ex. 4. Yet, Plaintiffs were consistently assigned to menial, unskilled work, like milking cows, cleaning manure, transporting animals with tractors, and whatever else Defendants needed done, even when Plaintiffs told Giles the assignments did not amount to animal science.[2] Ex. 19, at 16–17, 23–25, 50; Ex. 20, at 52–56, 80–82; Ex. 21, at 46–49, 52–55, 66; Ex. 22, at 45–46, 50–53; Ex. 23, at 56–66; Ex. 24, at 42–43, 53–54, 64, 81. Giles himself testified that there were "no specific activities [Plaintiffs] did as employees that were completely unique to them," and, indeed, Defendants designate Plaintiffs as "milkers" and "general laborers"—not animal scientists—in their employment records. Ex. 26, at 56; Ex. 2, at 7; Ex. 12. Notably, in preparation for their visa interviews, Defendants' agents warned Plaintiffs not to tell the Embassy they would be milking—yet, during depositions Plaintiffs stated that Giles and Funk observed them milking cows and did not stop them. Ex. 19, at 49–50; Ex. 20, at

---

[2] Contrary to Defendants' argument that Plaintiffs were not licensed to practice veterinary medicine in the U.S. and, therefore, were at most qualified to assist licensed professionals (*Mem. in Support of Defs.' Mot. for Summ. J.*, Dkt. 36-1, at 8 n. 1), Plaintiffs were not hired as veterinarians, but rather as animal scientists—these are two distinct professions.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

43; Ex. 22, at 29–30. Plaintiffs could not freely quit to work for another employer because Defendants told them if they quit, Defendants would report them to immigration authorities. Ex. 21, at. 56. Moreover, Plaintiffs visas specifically allowed them to work only for Defendants.

The present case is analogous to *People v. Alvarez*.[3] In *Alvarez*, the jury was presented with three charges of labor trafficking, one for each of three victims. Ultimately, the jury found the defendant guilty for one charge of labor trafficking, not-guilty for another, and were hung on the final. The primary distinction between the guilty and not-guilty verdicts was that the victim for whom a not-guilty verdict was issued did not work for the defendant after threats of deportation were made. In contrast, the other victim worked a single day for the defendant after he issued threats of deportation. Here, Plaintiffs each worked approximately one year for Defendants under threat of serious harm and/or deportation. Ex. 8. The instant case is also more egregious than the *Alvarez* case in that Defendants recruited Plaintiffs using visa fraud. It is irrelevant that ultimately Defendants fired three of the Plaintiffs and the other three quit, as *Alvarez* shows that even one day of forced labor is enough to prove a defendant's intent to compel forced labor. Similarly, *Alvarez* shows it is not conclusive that Plaintiffs retained their passports, were able to have visitors at their house, had cell phones, cars, and permission to temporarily leave Idaho, came to the U.S. of their own free will, or were paid for their services.[4]

---

[3] At this time, the *Alvarez* court has not finished preparing trial court transcripts, but the court reporter has confirmed she will send certified copies to Plaintiffs' counsel. Once counsel has the transcripts, counsel intends to file them with this Court in a request for judicial notice.
[4] These are common misconceptions attributed to human trafficking cases. *See* NAT'L HUMAN TRAFFICKING HOTLINE, *Myths & Misconceptions*, https://humantraffickinghotline.org/what-human-trafficking/myths-misconceptions (last visited Oct. 5, 2018).

**b. Defendants also deny they committed trafficking into servitude.**

Under the TVPRA, it is unlawful for a person to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of" Chapter 77. 18 U.S.C. § 1590(a). A Section 1590 claim depends on a predicate TVPRA offense, like forced labor. *Lagayan v. Oden*, 199 F. Supp. 3d 21, 29 (D.C. Dist. 2016); *see Aguirre*, 961 F. Supp. 2d at 447 (denying summary judgment in part because of disputed material facts regarding § 1589 claim). As explained *supra*, Defendants Funk, Giles, Funk Dairy, and Shoesole Farms knowingly obtained and/or provided general dairy labor from Plaintiffs in violation of Section 1589. Moreover, they personally recruited Plaintiffs for work, (initially) paid for Plaintiff Martinez's airfare to Idaho, and set Plaintiffs up in housing during their employment. Thus, Defendants are not entitled to summary judgment on Plaintiffs' TVPRA claims.

**C. The Court has proper subject matter jurisdiction over Plaintiffs' claims.**

Federal district courts have original subject matter jurisdiction over civil actions arising under Federal law. 28 U.S.C. § 1331. Additionally, the courts "have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy," including state law claims. *Id.* at § 1367(a). As discussed *supra*, Plaintiffs have sufficient evidence to support their right to a jury trial regarding their Federal TVPRA claims. And, as discussed *infra*, Defendants are not entitled to summary judgment on Plaintiffs' common law claims, which arise directly from their TVPRA claims. Therefore, and because this Court has original subject matter jurisdiction over the TVPRA claims, this Court has supplemental jurisdiction over Plaintiffs' common law claims. Moreover, Plaintiffs' common law claims do not raise complex or novel issues of State law or

predominate over their TVPA claims, and, because Defendants have not presented compelling reasons to otherwise decline jurisdiction, this Court should continue to exercise supplemental jurisdiction over Plaintiffs' common law claims. *Id.* at § 1332(c).

### D. Defendants are not entitled to summary judgment because there is a genuine dispute whether they committed common law violations against Plaintiffs.

#### a. Defendants deny material facts regarding the fraud-based claims.

Plaintiffs allege three common law torts sounding in fraud: intentional fraud, concealment, and false promise. *First Amended Compl.*, Dkt. 24, at ¶¶ 74, 82, 87. By clear and convincing evidence, a plaintiff alleging fraud must establish:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*G&M Farms v. Funk Irrigation Co.*, 808 P.2d 851, 855 (Idaho 1991). Unlike a speaker's "opinion or prediction about a future event" (*County Cove Dev., Inc. v. May*, 150 P.3d 288, 293 (Idaho 2006)), a claim of fraud may be based on a hearer's reliance on the terms of employment offered by the speaker (*O'Neal v. Stifel, Nicolaus & Co.*, 996 S.W.2d 700, 703 (E.D. Mo. 1999)). *See Aguirre*, 961 F. Supp. 2d at 449–50 (finding disputed facts regarding whether employers made representations as claimed by plaintiff).

Simply put, there are material factual disputes regarding whether Defendants intentionally misrepresented and/or fulfilled material promises regarding the terms and conditions of Plaintiffs' employment. As clearly stated in their letter in support of Plaintiffs' visa applications, Defendants offered them professional-level work as animal scientists for a three-year period, but that never occurred. By verbal statements, Defendants also promised to provide Plaintiffs with housing, childcare, and transportation to and from work, which Plaintiffs

understood would be free, and that after one year Plaintiffs would receive a $2,000 bonus, one week of paid vacation, and return travel. Defendants also led Plaintiffs to believe they would fully cover and/or reimburse them for travel costs to Idaho and would receive raises. In reality, Plaintiffs only received two months of free housing (Ex. 3) and all but Plaintiff Neri received the $2,000 and week of vacation pay, although only Plaintiff Martinez received the full minimum worth of vacation pay: $720, reflecting $10 an hour, 12 hours a day, six days a week—it is unclear how Defendants came up with the amount given to the other Plaintiffs. Ex. 13–18. Moreover, not all Plaintiffs received raises, and even for those who did Defendants randomly took away their raises. Ex. 12. Finally, Defendants did not provide return travel to Mexico. Ex. 21, at 35–36; Ex. 24, at 33.

The record shows that Defendants had experienced a severe labor shortage and were in trouble with ICE when they sought to recruit Plaintiffs. Defendants were desperate and knew they had to make an enticing offer, otherwise Plaintiffs would never have accepted an offer for general labor dairy work. Based on Defendants' representations, Plaintiffs agreed to uproot themselves from Mexico for three years. Some of them left spouses and children to come to Idaho, some quit their jobs believing the work opportunity with Defendants would be worth it to advance their careers, and Plaintiff Gastelum had to sell property and go into debt just to afford the airfare to Idaho. Ex. 20, at 12–13; Ex. 24, at 34. Plaintiffs went to great lengths in reliance on Defendants' offer only to find out that Defendants would not be covering living and travel expenses, let alone provide any help in arranging childcare and transportation to work. Moreover, Plaintiffs were not assigned to professional-level work as animal scientists, no matter how often or in what manner they attempted to communicate their frustrations with Defendants. Instead, Defendants assigned them to milking, cleaning garbage and feces, and to whatever job

was needed. Defendants simply never intended to provide Plaintiffs with animal science work. Ex. 26, at 47–51, 56. Finally, Plaintiffs had a right to rely on Defendants' offer because not only did it effect the terms of their employment, but they had no other way of ensuring what Defendants told them was true.

Defendants concealed from Plaintiffs material facts about working conditions that would have influenced their decision to accept the job offer, including unskilled and strenuous physical labor, dangerous working conditions, no structured meal time, refrigerator, sanitary place to eat, or childcare. That the job did not actually include childcare was important for Plaintiff Padilla, as Defendants were aware that she was bringing her toddler with to Idaho. Ex. 22, at 41–42. That it did not include a structured meal time, refrigerator, or sanitary place to eat was particularly important for Plaintiff Neri who, as Defendants were aware, suffered from diabetes; yet, Defendants expected him to work twelve hour shifts with no break or place to store his insulin. These material facts are in dispute and, thus, Defendants are not entitled to summary judgment.

### b. There are genuine disputed issues of material fact regarding Plaintiffs' claim for negligent misrepresentation.

A defendant is liable for negligent misrepresentation if, in failing to exercise reasonable care, he makes a false representation of material fact for the purpose of inducing another to act, that person does so act, resulting in injury. Restatement (Second) of Torts § 552(1). While purely economic loss is generally not recoverable, there are two exceptions, one of which is a special relationship. *Aardema v. United States Dairy Sys.*, 215 P.3d 505 (Idaho 2009); *see Aguirre*, 961 F. Supp. 2d at 452–53 (discussing special relationship is an exception, not a requirement). Here, Plaintiffs suffered personal and lasting injuries while working for Defendants. Therefore, there are genuine disputed issues of material fact in this case.

### c. Defendants deny material facts regarding Plaintiffs' contract claims.

There is legal and factual support for Plaintiffs' claims of breach of contract and of the implied covenant of good faith and fair dealing. *First Amended Compl.*, Dkt. 24, at ¶¶ 97–104.

> A breach of contract is non-performance of any contractual duty of immediate performance. It is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract. "A substantial or material breach of contract is one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." Whether a breach of contract is material is a question of fact.

*Indep. Lead Mines Co. v. Hecla Mining Co.*, 137 P.3d 409, 415 (Idaho 2006) (citations omitted).

Through in-person statements in Mexico and in e-mails, letters, and phone conversations prior to Plaintiffs' employment period, Defendants offered specific terms and conditions, stated *supra*. Plaintiffs, on their part, performed every task Defendants directed them to do. However, Defendants breached their duty by failing to provide Plaintiffs with substantive work as animal scientists, promised travel and living arrangements, stable wage raises, and discharging Plaintiffs Gastelum, Martinez, and Ortiz early. Although Plaintiffs Neri, Munoz, and Padilla quit, they did so only when work conditions became life-threatening and/or when it was apparent that Defendants were not going to fulfill their promises; in other words, only when Defendants had breached the contract. Ex. 19, at 52; Ex. 22, at 66–67. These facts are hotly contested.

The statute of frauds under Idaho Code § 9-505 does not apply because the period of employment for each Plaintiff was to be performed in three years, and, in any case, the letters in support of Plaintiffs' visa applications with a signature by Giles on behalf of Defendants suffices as a written contract. Additionally, "[u]nless an employee is hired pursuant to a contract that specifies the duration of the employment or limits the reasons for which an employee may be discharged, the employment is at the will of either party . . ." *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 387 (Idaho 2005). Thus, unlike in *Jenkins*, Plaintiffs were not-at will because,

while they did not have a contract specifying permissible reasons for termination, they had a contract that specified the duration of employment.

In *Metcalf v. Intermountain Gas Co.*, the Idaho Supreme Court "for the first time recognized an implied-in-law covenant of good faith and fair dealing in [all] employment contracts." 778 P.2d 744, 744 (Idaho 1989); *see also Jenkins*, 108 P.3d at 389–90 ("Such a covenant is found in all employment agreements, including employment-at-will relationships."). "An action by one party that violates, qualifies or significantly impairs any benefit or right of the other party under an employment contract, whether express or implied, violates the covenant." *Jenkins*, 108 P.3d at 390 (citing *Metcalf*, 778 P.2d at 627). The *Metcalf* court rejected "bad faith as the standard for determining whether the covenant has been breached." *Id.* "Instead, the covenant is an objective determination of whether the parties have acted in good faith in terms of enforcing the contractual provisions. *Id.*

Here, Defendants did not act reasonably in enforcing the terms of Plaintiffs' employment and, therefore, breached the covenant of good faith and fair dealing—or at least there are material issues in dispute on this claim. Under their employment agreement, Plaintiffs had a right, among other things, to work as animal scientists, a $2,000 bonus, one week paid vacation, and travel costs. Plaintiffs were hired, and therefore expected, to perform advanced theoretical skills and expertise at Funk Dairy. Instead, Defendants assigned them to menial, unskilled work. Even when Plaintiffs informed Giles that such work was not animal science, he would relocate them to another area of the dairy and assign them to other unskilled work. Defendants claimed three of the Plaintiffs were not meeting their standards and, therefore, were fired. But, this was a pretext—Plaintiffs were fired for voicing their frustrations about not getting to do what they were hired to do. Ex. 23, at 57–64.

Additionally, Defendants hired Plaintiff Neri, knowing his health-related needs, yet they failed to provide a structured meal time or a refrigerator for his insulin, causing his health to suffer and leaving him no option but to quit as soon as he could afford it, thereby giving up his end-of-year benefits. Plaintiff Padilla duly worked for Defendants for over one year; yet, after injuring her back at work, Defendants denied her recovery time-off, effectively forcing her to use her vacation week and, thereby denying her vacation. Ex. 22, at 35–37. The remaining Plaintiffs received paid vacation when their employment ended; however, Plaintiff Martinez was the only to receive the full minimum entitlement of $720. Finally, Defendants denied return travel.

### d.  Defendants deny material facts regarding Plaintiffs' damages.

As stated *supra*, Defendants caused Plaintiffs to cumulatively incur housing, travel, and childcare expenses, they cut short Plaintiffs' contract period, and they denied Plaintiffs experience as animal scientists; moreover, Plaintiffs were physically injured and suffered permanent physical impairments during employment. The fact that some of the Plaintiffs earned more money working at Funk Dairy than they previously had in Mexico simply does not exemplify that no injury occurred. Moreover, Defendants have always had in their possession documents from which they could calculate the nature and scope or Plaintiffs' losses, including but not limited to housing expenses, travel costs from Mexico, and unpaid wages and benefits.

Plaintiffs also seek recovery of punitive damages for Defendants' intentional fraud. *First Amended Compl.*, Dkt. 24, at ¶ 80. "In any action seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." Idaho Code § 6-1604(1). The record demonstrates that Defendants defrauded Plaintiffs and the U.S. government in recruiting and employing Plaintiffs and violated the TVPA to obtain general dairy

labor. Ex. 23, at 79. Such fraudulent and outrageous conduct is a prime instance that warrants exemplary and deterrence damages. *Ditullio v. Boehm*, 662 F.3d 1091, 1096–97 (9th Cir. 2011). Having established a basis for entitlement to punitive damages, the jury must decide whether and how much to award. *Soria v. Sierra Pac. Airlines, Inc.*, 726 P.2d 706, 724 (Idaho 1986).

### E.  Moreover, the record demonstrates that all four Defendants are liable for Plaintiffs' damages, including Defendants Funk, Giles, and Shoesole Farms.

In truth, Plaintiffs worked for Funk Dairy during the relevant period; however, all named Defendants in this case are liable for Plaintiffs' damages. First off, Defendants' alleged defenses regarding piercing the corporate veil ("PCV") and agency are improper. Essentially, these are affirmative defenses under Federal Rule of Civil Procedure 12(b)(2), arguing this Court lacks personal jurisdiction. Such arguments must be alleged in a motion to dismiss or an answer to the complaint, otherwise they are waived. Fed. R. Civ. P. 12(h)(1). As they only raise these points now at the summary judgment stage, Defendants have waived them. *See Doe v. Unocal Corp.*, 248 F.3d 915, 926–31 (9th Cir. 2001) (discussing PCV and agency in regards to personal jurisdiction); *see also Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920 (9th Cir. 2011), reversed on other grounds by *Daimler AG v. Bauman*, 571 U.S. 117 (2014) (same).

Second, Plaintiffs properly brought TVPRA claims against Defendants. The TVPRA provides for individual liability for damages and reasonable attorney's fees "against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)[.]" 18 U.S.C. § 1595(a); *see Aguirre*, 961 F. Supp. 2d at 460–61. Here, Funk and his wife are the sole owners and directors of Funk Dairy, as well as Shoesole Farm, so his financial benefit cannot be disputed. Ex. 28–29. Moreover, Giles stated during his deposition that the two farms have a symbiotic business relationship. Ex. 19, at 51–52; Ex. 26, at 90–91.

Further, Funk provided Plaintiffs with housing during their employment and he hired them for animal science work, yet he did not stop them when he observed them milking cows and performing other non-professional work. Giles is also liable as he made substantial efforts to and personally did recruit Plaintiffs, he supervised and interacted with them daily at work, and he assigned them to general work. Ex. 11, at 7. Moreover, he is Funk's son-in-law and the dairy manager at Funk Dairy, and he, along with Funk's wife, managed the housing provided to Plaintiffs. Ex. 22, at 74–75; Ex. 25, at 33–34, 46.

Third, Defendants should not be allowed to use Funk Dairy's corporate status to shield themselves from liability for Plaintiffs' common law claims. To pierce the corporate veil, the company must be the alter ego of an individual, meaning there must be "(1) a unity of interest and ownership to a degree that the separate personalities of the [company] and individual no longer exist and (2) if the acts are treated as acts of the [company] an inequitable result would follow." *Lunneborg v. My Fun Life*, 421 P.3d 187, 199 (Idaho 2018) (quoting *Vanderford Co. v. Knudson*, 165 P.3d 261, 270–71 (Idaho 2007)) (affirming PCV against company's sole director-shareholder and his wife). The second prong "requires something less than an affirmative showing of fraud but something more than the mere prospect of an unsatisfied judgment." *Id.* at 201 (referring to *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 756 (7th Cir. 2012). In making this determination, Idaho courts use various non-exclusive factors as helpful considerations, such as lack of corporate formalities, level of control over the company, and the decision-making process of the company. *Id.* at 199–200. Here, Funk co-owns Funk Dairy with his wife and employs Funk's son-in-law as dairy manager. Funk Dairy is clearly a family business that constitutes the same entity as Funk and Giles. Moreover, Plaintiffs, *supra*, have

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

established fraud-based common law claims. Funk and Giles must personally be held liable to deter them from committing similar wrongdoings to others.

Finally, an agency relationship cannot be disputed between Giles and Funk Dairy. "An agent is subject to liability to a third party harmed by the agent's tortious conduct . . . although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment." Restatement (Third) of Agency § 7.01.

> An agent is one who "act[s] on the principal's behalf and subject to the principal's control." Restatement (Third) of Agency § 1.01. . . . Any time one person does something for another, the latter is in all likelihood capable of evaluating and instructing the first. . . . [A]n agency relationship exists only if both the provider and the recipient have manifested assent that the provider will act subject to the recipient's control and instruction. *Id.* . . . [W]e do not maintain there needs to be an explicit agreement, but there must be at least some manifestation of assent to the principal's right to control.

*United States v. Bonds*, 608 F.3d 495, 506–07 (9th Cir. 2010). Here, at all relevant times, Giles was the dairy manager at Funk Dairy, in charge of its day-to-day operations and employee supervision. With Funk's authorization, Giles inquired into the NAFTA guest worker program for recruits and offered Plaintiffs terms and conditions. Ex. 26, at 57. Thus, Giles, as Funk's agent, is liable for the torts against Plaintiffs and resulting damages, discussed *supra*.

## V.    CONCLUSION

As there are credibility issues regarding facts that go to essential elements of Plaintiffs' claims, Defendants have not carried their burden of showing an absence of genuine material issues in dispute. Thus, the Court should **DENY** Defendants' *Motion for Summary Judgment*.

Dated: October 17, 2018                    Respectfully submitted,

MARTINEZ AGUILASOCHO & LYNCH, APLC

/s/ Edgar Ivan Aguilasocho
Edgar Iván Aguilasocho, Esq.
Attorney for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT