UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CESAR MARTINEZ-RODRIGUEZ; DALIA PADILLA-LOPEZ; MAYRA MUNOZ-LARA; BRENDA GASTELUM-SIERRA; LESLIE ORTIZ-GARCIA; and RICARDO NERI-CAMACHO,<br><br>    Plaintiffs,<br><br>    v.<br><br>CURTIS GILES, an individual; DAVID FUNK, an individual; FUNK DAIRY, INC., an Idaho corporation; SHOESOLE FARMS, INC., an Idaho corporation, JOHN DOES 1-10,<br><br>    Defendants. | Case No. 1:17-cv-0001-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendants Curtis Giles, David Funk, Funk Daily, Inc., and Shoesole Farms, Inc.'s (Collectively "Defendants" or "Funk Dairy") Motion for Summary Judgment (Dkt. 35) and Motion to Strike Plaintiffs' Expert Disclosure (Dkt. 36).

On January 9, 2019, the Court held oral argument and took the motions under advisement. Upon review, and for the reasons set forth below, the Court finds good cause to GRANT Defendants' Motion for Summary Judgment.

## II. BACKGROUND[1]

Plaintiffs are six professional veterinarians from Mexico who allege that Defendants have engaged in a "criminal conspiracy to bring Mexican nationals to the United States illegally for the purpose of forced labor." Dkt. 1 at 1. Based on these allegations, Plaintiffs assert claims of Forced Labor and Trafficking into Servitude under the Trafficking Victims Protection Reauthorization Act (18 U.S.C. §§ 1589, 1590, and 1595), as well as six state law claims under Idaho law.

Broadly speaking, Plaintiffs assert that Defendants conspired to recruit experienced Mexican veterinarians to work in the United States under the false pretense that they would be professional animal scientists, only to be hired as low-wage, general laborers at Funk Dairy. *Id.* Plaintiffs allege that these acts violated US immigration laws. They also assert that Defendants subjected them to long working hours under arduous conditions and forced them to stay under threat of deportation, fear, and unfamiliarity with the English language and American legal system. *Id.*

A. Factual background

Cesar Martinez-Rodriguez, Dalia Padilla-Lopez, Mayra Munoz-Lara, Brenda Gastellum-Sierra, Leslie Ortiz-Garcia, and Ricardo Neri-Camacho (collectively "Plaintiffs") are all native citizens of Mexico.

Funk Dairy is a commercial dairy operation located near Murtaugh, Idaho. The

---

[1] The following facts are construed in the light most favorable to Plaintiffs—the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

MEMORANDUM DECISION AND ORDER - 2

owners of the dairy are David Funk and his wife, who is not individually named as a defendant in this case. David Funk's son-in-law, Curtis Giles, manages dairy operations. David Funk and his wife also own and operate an independent farming operation known as Shoesole Farms. Giles is not involved with the farming operation. Funk Dairy is an integrated operation—meaning the dairy performs all aspects necessary for the production and sale of raw milk. It impregnates cows and births calves, raises heifer calves, sells steer calves, cares for sick animals, milks cows, and performs all other aspects related to a large-scale dairy operation.

In the Fall of 2014, Funk Dairy began recruiting skilled labor from Mexico, specifically intending to obtain workers that qualified for the North American Free Trade Agreement ("NAFTA") Visa program—specifically the "TN", or "Trade", Visa.

At that time, Plaintiffs all had 4-year college degrees and were each licensed as animal scientists or veterinary scientists in Mexico. Giles personally attended Plaintiffs' universities, presented on the employment opportunity at Funk Dairy, interviewed each Plaintiff, made each Plaintiff a job offer (which each accepted), and then put each Plaintiff in touch with legal counsel in order to secure their TN Visas.

In securing employment, it was Plaintiffs' understanding that they would be receiving: $10 per hour (with the opportunity for raises) for working approximately 10-12 hours per day, 6 days a week; a $2,000 bonus after one year of service; six days of paid vacation after one year of service; initial help with housing and transportation; and that their employment would last for three years. The terms of employment were never reduced to a signed writing.

Funk Dairy put each Plaintiff in touch with legal counsel to assist in obtaining TN Visas. This process involved applying to, and subsequently being interview by, the U.S. Department of State. As part of this process, Funk Dairy made certain representations to the U.S. Department of State regarding the nature of the employment and the kind of work that each Plaintiff would perform so the government could determine whether each Plaintiff qualified for the NAFTA TN Visa program. Plaintiffs allege that Funk Dairy's legal counsel specifically instructed them not to say that they would be milking cows.

Upon arrival at Funk Dairy, Plaintiffs contend that Defendants tasked them with menial, unskilled farm duties, despite their understanding that they would be animal scientists. Additionally, Plaintiffs assert that Defendants monitored their movements and communications, charged them for things such as rent and transportation, reduced their income arbitrarily, and generally failed to abide by the agreed upon terms of their employment. Ultimately, three Plaintiffs quit, and Funk Dairy terminated three Plaintiffs.

B. Procedural background

Plaintiffs filed their original Complaint on January 1, 2017. In their Complaint, Plaintiffs alleged various causes of action against the present Defendants, but also against Jeremy Pittard. Pittard is the attorney who each Plaintiff met with prior to their interview with the U.S. Department of State. On February 28, 2018, Pittard filed a Motion to Dismiss. Dkt. 13. The Court ultimately granted Pittard's Motion (Dkt. 23), but gave Plaintiffs an opportunity to amend their Complaint in order to cure deficiencies outlined in the Court's Decision. Plaintiffs elected not to file an Amended Complaint that included additional allegations or facts against Pittard, but submitted an Amended Complaint

MEMORANDUM DECISION AND ORDER - 4

nonetheless. *See* Dkt. 24.

At the completion of fact and expert discovery, Defendants filed the two Motions currently pending: A Motion for Summary Judgment, and a Motion to Strike Plaintiffs' Expert Disclosures.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.*

To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted).

Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997

(9th Cir. 2001).

# IV. ANALYSIS

In this case, Plaintiffs allege numerous federal and state law causes of action against Defendants. The crux of this case, however, centers around the provisions of the Trafficking Victims Protection Reauthorization Act ("TVPRA") (18 U.S.C. § 1581 et. sec.). Plaintiffs claim that Defendants specifically violated two provisions of the Act: the forced labor provision (18 U.S.C. § 1589) and the trafficking into servitude provision (18 U.S.C. § 1590).

A. Forced Labor

The forced labor provision of 18 U.S.C. § 1589 provides, in relevant part, as follows:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).
> . . .
> (c) In this section:
> (1) The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.
> (2) The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a

reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589.

As the Court noted in its prior decision, "in order to show that someone violated the Federal Forced Labor Statute, it must be demonstrated that first, the threat of harm was serious; and second, that the defendant had the requisite *scienter*, or bad state of mind." *Martinez-Rodriguez v. Giles*, No. 1:17-CV-0001-DCN, 2017 WL 4076095, at *3 (D. Idaho Sept. 14, 2017) (citing *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011)). The Court will take these two elements up in reverse order as the knowledge requirement can be addressed in short order; while the threat of harm question requires more analysis.

      1. Scienter (bad state of mind)

Plaintiffs claim that Funk Dairy "abus[ed] the legal process through obtaining fraudulent NAFTA professional visas with no intention of providing professional work to Plaintiffs" and "by causing Plaintiffs to fear that they would be deported to Mexico for complaining about illegal working conditions and breach of contract." Dkt. 24, at 19.

Specifically, Plaintiffs allege that even though Funk Dairy recruited them as professionals it *knew*, and intended all along, to simply use them as menial laborers. Plaintiffs, however, only provide conclusory statements to this effect with scant evidence in support of such a proposition. Plaintiffs broadly claim that because Funk dairy did not follow through on its representations concerning wages, vacation, bonuses, housing etc., this is evidence that it intended to bring Plaintiffs here under false pretenses and reap the

MEMORANDUM DECISION AND ORDER - 7

benefits of cheap labor.

This argument is difficult to accept, however, as numerous Plaintiffs (but not all) received many (but not all) of the promised benefits. Furthermore, the reasons that certain Plaintiffs did not receive some of the benefits that others did receive were not systematic. In other words, it is clear from Plaintiffs' own testimonies that, collectively, they did not receive all the benefits they were promised. Nevertheless, the reasons Funk Dairy withheld some of these benefits were unique to each person's situation. The Court cannot make the leap from the idea that just because certain Plaintiffs did not receive all of the promised benefits to the idea that Funk Dairy intended to deceive the group collectively from the beginning in furtherance of a forced labor scheme.

Additionally, Plaintiffs allege that Funk Dairy's subtle misstatements in obtaining NAFTA visas are evidence of initial abuse of the legal process and that certain threats—concerning removal to Mexico—that came later are also evidence of continued abuses of the legal process. Plaintiffs assert that these legal abuses support their theory that Funk Dairy was trying to skirt the law because it knew all along that it would never keep its promises to Plaintiffs.

As to the first idea (misstatement to the U.S. Department of State), Plaintiffs point to the fact that Funk Dairy's attorney specifically instructed each of them not to say that they would be milking cows. Funk Dairy does not dispute this, but this admonition alone is no "smoking gun." The fact is, Funk Dairy recruited Plaintiffs under certain parameters—specifically the provisions of the TN Visa program—and accordingly, certain conditions had to be met. Preparing someone for an interview (even "coaching"

them) without more, is insufficient to rise to the level of a covert or nefarious scheme.
The Court has already dismissed Defendant Pittard (Funk Dairy's attorney) for this very
reason—a lack of evidence in support of any claims against him—and will likewise
dismiss this argument.

As to the second idea (of continued threats as evidence of legal abuse), the Court
will discuss these purported threats at length in the following section and whether they
induced Plaintiffs' labor, but as to whether they were continuing violations of the legal
process the Court agrees with Funk Dairy. Most of the comments made to Plaintiffs about
removal to Mexico were not threats, but simply statements of the law: because the U.S.
Department of State had approved each Plaintiff under the NAFTA TN work program
visa at Funk Dairy, if any Plaintiff failed to continue working for Funk Dairy, the United
States government could revoke their status and send them back to Mexico. As the Ninth
Circuit has noted, it is the Court's responsibility to "distinguish between 'improper
threats or coercion and permissible warnings of adverse but legitimate consequences.'"
*Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (citing
*United States v. Bradley,* 390 F.3d 145, 151 (1st Cir. 2004), *judgment vacated on other
grounds,* 545 U.S. 1101 (2005); *cf. Dann,* 652 F.3d at 1170.

Again, the Court will discuss some of the other so-called threats in detail below,
but suffice it to say, while Plaintiffs call into question Funk Dairy's motives, the evidence
proffered in support does not raise a material dispute. Plaintiffs *believe* that Funk Dairy
pre-planned its scheme to defraud them and allege that the Dairy knew and intended to
coerce them into staying once they arrived, but Plaintiffs cannot point to anything

MEMORANDUM DECISION AND ORDER - 9

concrete in support of such a position.

    2. Threat of Harm

    Moving on from the knowledge requirement, the Court must address how—if at all—Funk Dairy *forced* Plaintiffs to perform any labor. Said another way, even if Funk Dairy knew, planned, or intended to fool Plaintiffs into performing sub-servient tasks, to be considered Forced Labor under the TVPRA, there must be evidence of just that— force. This is the "by means of" test.

    An individual "is guilty of forced labor if he intends to cause a person to believe that if she does not work, she will suffer . . . serious harm[.]" *United States v. Dann*, 652 F.3d 1160, 1169–1170 (9th Cir. 2011). "[T]he threat [is] considered from the vantage point of a reasonable person in the place of the victim [and] must be 'sufficiently serious' to compel that person to remain." *Id.* at 1170. Overt or subtle threats of financial, reputational, and/or immigration harm can suffice. *Id.* at 1172.

    In this case, Plaintiffs allege that Funk Dairy monitored their communications, limited their interactions with others, intervened unnecessarily in their private lives, and generally were overbearing and unsympathetic to health,[2] family, or work concerns.

    Furthermore, Plaintiffs allege that Funk Dairy—more specifically Giles— threatened them on multiple occasions. Funk Dairy vehemently denies all "monitoring" or "controlling" behavior, particularly any threats, and only admits that they worked their

---

[2] One instance that is somewhat troubling is that one of the Plaintiffs had diabetes and Defendants seemed to be particularly unsympathetic to his plight—not allowing breaks, a place to sit, or an appropriate location to store insulin. Even this lack of sympathy, however, is not enough to show a "force of labor."

employees hard, but that each Plaintiff was fully aware that the job would be physically demanding.

In support of its claim that it did not retain Plaintiffs' labor by means of threat or force, Funk Dairy cites to *Headley v. Church of Scientology Int'l.* In *Headley,* two former ministers of the Church of Scientology (the Headleys) sued the Church, alleging that the Church forced them to provide labor in violation of the TVPRA when they worked for the "Sea Org," an elite religious order within the Church that acts as the Church of Scientology's evangelical wing.

In that case, the Headleys presented evidence that the Church worked them each over 100 hours per week, censored their mail, monitored their phone calls, required them to obtain permission to access the Internet, assigned them manual labor as discipline, were physically and verbally abusive to them, and even prohibited them from having children—even to the point that when one plaintiff became pregnant, she was told that if she did not have an abortion she would have to perform manual labor. 687 F.3d 1173, 1176 (9th Cir. 2012). Even in the face of all this evidence, the Ninth Circuit found that the plaintiffs forced-labor claims failed.

> In our view, the text of the Trafficking Victims Protection Act resolves this case. The Act bars an employer from obtaining another's labor "by means of" force, physical restraint, serious harm, threats, or an improper scheme. 18 U.S.C. § 1589(a)(1), (a)(2), (a)(4). That text is a problem for the Headleys because the record contains little evidence that the defendants obtained the Headleys' labor "by means of" serious harm, threats, or other improper methods.
>
> . . .

[Plaintiffs'] focus their attack on the discipline, lifestyle, and familial constraints imposed as part of Sea Org life. But the record does not suggest that the defendants obtained the Headleys' labor "by means of" those features of Sea Org life. To the contrary, the record supports the conclusion that such features caused Marc and Claire to *leave* the Sea Org and thus to stop providing labor.

. . .

The Headleys have simply not marshaled enough evidence to satisfy the textual demands of section 1589. That text requires that serious harm befall an employee "if she did not continue to work" or a threat that "compel[s] [her] to *remain*" with the employer. *United States v. Dann,* 652 F.3d 1160, 1170 (9th Cir.2011) (emphasis added). Here, the record shows that the adverse consequences cited by the Headleys are overwhelmingly not of the type that caused them to continue their work and to remain with the Sea Org.

*Id.* at 1179-80. In this case, a similar analysis applies.

In reviewing what evidence has been presented—even assuming it is all true (which Funk Dairy strongly rejects)—similar to the Headleys' situation, Plaintiffs here have not presented any evidence that would indicate that Funk Dairy obtained, and kept, their labor *by means of* serious harm, threats, or other improper methods. This is most strikingly evidenced by two facts: first, that three of the Plaintiffs quit during their tenure with Funk Dairy because they were dissatisfied with their employment; and second, that Funk Dairy terminated the remaining three employees because they were dissatisfied with their work performance. If Funk Dairy was truly forcing Plaintiffs to perform labor, they would not have allowed three Plaintiffs to quit, nor terminated three Plaintiffs themselves. In short, these "harms" were not so "sufficiently serious so as to compel [Plaintiffs] to remain in [Funk Dairy's] employ." *Dann*, 652 F.3d at 1171. Certain

Plaintiffs' personal choices[3] to leave their employment with Funk Dairy was just that: a personal, independent choice.

Other evidence that supports a finding of "no force" are Plaintiffs' own admissions that their communications and interactions with others were not monitored, that they were free to choose where they lived, allowed to obtain driver's licenses and automobiles, allowed to travel within the United States and abroad, and free to control their own finances. *See generally* Dkt. 43-2 (compiling Plaintiffs' deposition testimonies). Even though it does appear that Funk Dairy was a bit meddlesome in Plaintiffs' personal affairs and had certain rules or restrictions it required its employees to follow (on and off the job), none of these things forced any of the Plaintiffs to stay. Each was free to live, free to work, and—according to many of the Plaintiffs' own testimonies—free to leave employment at any time. *See e.g.* Dkt. 35-13, at 15, Dkt. 35-8, at 16.

To be sure, if Plaintiffs' deposition testimonies are taken as true, Giles did say inflammatory things—statements that could arguably be taken as thinly veiled threats— towards Plaintiffs. That said, after reviewing all relevant portions of Plaintiffs' depositions, like the Headleys in the Scientology case, it is those features of their employment that ultimately caused Plaintiffs to quit, but did not necessarily force them to stay.

---

[3] The Court notes that these three departures did not all happen at once or after a singular or noteworthy event. While the work conditions or personal circumstances may have precipitated their departure, the three Plaintiffs who left did so of their own volition and without interference.

In this case, the sole example of Funk Dairy taking any action that could be considered threatening is a number of Plaintiffs' assertions that Giles told them not to talk about their salaries with other employees or that he "would return [them] back to Mexico." Dkt. 38-8, at 9; Dkt. 38-11, at 16. Even here though, there are nuances to each Plaintiff's explanation of these threats. Some say that Giles told them if they spoke to others about their salaries they would have to return to Mexico, but also say (often in response to the same question) that they understood they could quit employment at any time. *See e.g.* Dkt. 38-7, at 9. Others more broadly state that Giles simply said that if their employment ended they would have to return to Mexico.[4] *See e.g.* Dkt. 38-12, at 18. The most egregious version is one Plaintiff's assertion that Giles "always said he could return us at any moment" (Dkt. 38-12, at 18) and that on one occasion when a Plaintiff failed to show up for work, Giles became angry and said that this particular Plaintiff should "thank God that he (Curtis) didn't deport [him]." (Dkt. 38-11, at 16).

The question then is whether this type of language compelled or coerced Plaintiffs to remain employed. Under the circumstances, the Court finds that even these threats were not "sufficiently serious to compel [Plaintiffs] to remain" or that any of the statements would instill in Plaintiffs a fear that if they did not work they would suffer "serious harm." *Dann*, 652 F.3d at 1169–1170.

---

[4] This statement in particular is difficult to see as a threat as it is a true statement of law. To be clear, one could quite plausibly infer that the implication was "stay employed at all costs or you'll be deported." That said, even though this statement could cause "fear," the fear stems from the law, not necessarily the person saying it. Again, the Court "must distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences." *Headley*, 687 F.3d at 1180 (internal quotation marks and citations omitted).

The provisions of the TVPRA at issue here are unique, and among the Circuits—including the Ninth Circuit—"there is limited case law . . . discussing the types of acts and conduct that qualify as means of serious harm or abuse of law or legal process for purposes of TVPRA liability." *Echon v. Sackett*, No. 14-CV-03420-PAB-NYW, 2017 WL 4181417, at *13 (D. Colo. Sept. 20, 2017). Additionally, even though there are a handful of District Courts (within the Ninth Circuit and without) that have found that the "threat of deportation *may* itself constitute a threat sufficient to satisfy the . . . element[s] of forced labor" (*Lesnik v. Eisenmann SE*, No. 16-CV-01120-LHK, 2018 WL 4700342, at *13 (N.D. Cal. Oct. 1, 2018) (citing *Echon* at *14)), it is clear that this decision is left to the Court's discretion.

> Typically . . . forced labor situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.

*Muchira v. Al–Rawaf*, 850 F.3d 605, 618–19 (4th Cir. 2017) (quoting *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015) and collecting cases) (internal quotation marks and citation omitted)). This said, the situation need not always be so dire. Courts have frequently found that "serious harm" includes "threats of any consequences, whether physical or non-physical, that are sufficient under all of the surrounding circumstances to compel or coerce a reasonable person in the same situation to provide or to continue providing labor or services." *Shukla v. Sharma*, 2012 WL 481796, at *2

(E.D.N.Y. Feb. 14, 2012) (quoting *Bradley,* 390 F.3d at 151).[5]

"When considering whether an employer's conduct was sufficiently serious to coerce the victim to provide labor or services against her will, we must also 'consider the particular vulnerabilities of a person in the victim's position.'" *Muchira*, 850 F.3d at 618 (quoting *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015)). Courts look to whether a defendant's "misconduct has created a situation where ceasing labor would cause a plaintiff serious harm," recognizing that what constitutes serious harm for that plaintiff must be determined by considering the totality of the circumstances presented. *Nuñag–Tanedo v. E. Baton Rouge*, 790 F. Supp. 2d 1134, 1145 (C.D. Cal. 2011). Serious harm encompasses "not only physical violence, but also more subtle psychological methods of coercion." *Bradley*, 390 F.3d at 150. However, "not all bad employer-employee relationships will constitute forced labor." *Aguilera v. Aegis Communications Group, LLC*, 72 F. Supp. 3d 975, 978 (W.D. Mo. 2014). *See also Muchira*, 850 F.3d at 619–20 (affirming award of summary judgment to defendants, and observing that plaintiff admitted that she came to the United States willingly, defendants never

---

[5] The *Shukla* court relied on law from the Second, Eighth, and Ninth Circuits to determine that a worker's "employment and living conditions" may provide support for finding that a defendant's threats "plausibly . . . compelled the victim[ ] to serve." *Shukla*, 2012 WL 481796, at *2 (quoting *United States v. Farrell,* 563 F.3d 364, 373 (8th Cir. 2009) and citing *United States v. Veerapol,* 312 F.3d 1128, 1130–21 (9th Cir. 2002) (considering working conditions, including "excessive working hours," in analyzing involuntary servitude claim). *See also United States v. Sabhnani*, 539 F. Supp. 2d 617, 620 (2d Cir. 2010) (affirming forced labor convictions where victims, who did not speak English and did not know how to drive or use a telephone, were, among other things, brought into the United States illegally, physically abused, forced to sleep on the floor, dressed in rags, provided inadequate food, and threatened with arrest); *United States v. Calimlim,* 538 F.3d 706, 713 (7th Cir. 2008) (affirming forced labor conviction of defendants who kept Filipino woman for nineteen years, requiring her to work sixteen-hour days, seven days a week, rarely permitting her to walk outside, and allowing her to speak with her family on only a few occasions).

physically abused her, never physically restrained or impeded her from leaving her employment situation, and defendants never threatened her or her loved ones with physical harm, arrest, deportation, adverse immigration consequences, or any other legal consequences if she left their employment); *Bradley*, 390 F.3d at 155 (noting distinction between "merely abusive employers" and employers who "deliberately sought to compel forced labor").

Upon review, and after an extensive evaluation of all relevant caselaw, the Court finds that when viewed under a totality of the circumstances—and considering Plaintiffs' respective ages and experiences—nothing in the record (including Giles' threats) rises to the level of forced labor.

As to the statements instructing Plaintiffs to not share wage details with each other or other employees, the Court notes that this language does not necessarily lend credence to the forced labor argument because, even if viewed as a "threat," it was not actually about work. The threat was not "do your job, or I'll send you home"—and thus used to entice the Plaintiffs to continue laboring—but was rather "do not talk about your salary or I'll send you home"—and was used apparently as a ploy to keep Plaintiffs silent on the issue of money. The Court is not trying to split a fine hair, but the inducement to stay employed was secondary to the inducement to remain quiet about wages in front of other employees. This threat was not used to procure labor, but confidentiality.

As for the more incendiary language that Giles could send Plaintiffs back to Mexico at any time or that one Plaintiff should be grateful he was not sent back for failing to show up at work, this intimidating language is insufficient to constitute a threat

under the TVPRA. While arguably rude, this language is not a true threat of deportation towards Plaintiffs that "forced" them to labor for Defendants (i.e. this is the abusive employer vs. compelling forced labor principle outlined in *Bradley*). Simply put, Giles' language did not have any lasting effects on Plaintiffs as half of them ultimately decided to quit. Looking at the totality of the circumstances, and against the backdrop of the cases cited herein, Giles language does not rise to the level necessary to support a claim of forced labor and no reasonable juror could conclude otherwise.

Finally, as will be discussed *infra*, *see* Section IV(A)(4), it is not entirely clear that Giles is an appropriate defendant in this case. In other words, the sole evidence of any threatening language comes from a person whose actions *may or may not even be attributable to Funk Dairy*.

In conclusion, Plaintiffs have failed to present sufficient evidence in support of the "express *scienter* requirement," *Calimlim*, 538 F.3d at 711, of section 1589, nor have they put forth the necessary evidence to support the claim that Funk Dairy's behavior was so oppressive or threating that it coerced each of them into laboring against his or her will.

Next, the Court will address some associated arguments raised by Plaintiffs. First—in support of this claim and others—Plaintiffs repeatedly state that while they knew they were at will employees and free to go at any time, the totality of Funk Dairy's actions essentially made it impossible for them to leave and this, in and of itself, is an indication of forced, or coerced, labor. Specifically, Plaintiffs claim that under Funk Dairy's financial scheme (of random charges, known and unknown housing and transportation costs, and inconsistent raises or bonuses) they had to remain employed

against their will until they could save enough money to either leave Funk Dairy's employ or return home.

Setting aside the question of whether this behavior could even be considered some sort of implied or subtle coercion to retain Plaintiffs' labor, this idea is no different than any other employed person who needs money to survive, move up in life, or move on from their current job (i.e. lots of people continue working "dead-end" jobs because they do not have the financial means to quit or find other employment). Plaintiffs' argument is further undercut by the fact that some of them returned to Mexico during their employment, some bought cars, some rented homes, and some went on vacation. Presumably had Plaintiffs been so despondent that they could not leave Funk Dairy for financial reasons, they would not have undertaken these other financially draining activities or situations. And, as repeatedly noted, the financial situation was not so dire or controlling that it could not be overcome as three Plaintiffs did ultimately quit and return to Mexico.

As an aside, this argument by Plaintiffs also lacks the requisite scienter, or bad state of mind. Even if Funk Dairy's financial structure was oppressive or unreasonable, there is no indication that it was undertaken for the purpose of inducing Plaintiffs to stay employed—as opposed to Funk Dairy being a financial "tight-wad" or just another bad employer.[6] See _Muchira_, 850 F.3d at 622 (determining that "even if there were sufficient

---

[6] The Court does not mean to disparage the reputation of Funk Dairy. The Court is simply taking the facts (Continued)

evidence upon which a jury could conclude that [] employment conditions were "sufficiently serious" to cause [Plaintiff] to reasonably believe that she could not terminate her employment and return [home], there is no evidence that [Defendants] *knowingly* subjected [Plaintiff] to those conditions as a means to coerce her into staying when she otherwise would have left").

Second, Plaintiffs repeatedly emphasize the idea that contrary to initial discussions, Funk Dairy forced them to perform manual (or menial) labor rather than animal science work and that this too stands as evidence of a scheme to violate the TN Visa program and coerce forced labor. Although it does appear from the record that Plaintiffs spent the majority of their time performing what likely would be considered menial or un-skilled tasks, it is also clear from the record that Plaintiffs did perform activities more associated with animal science or veterinarian work. *See* Dkt. 43-3. Again, even though not every Plaintiff performed every task they thought they might as part of their employment, most Plaintiffs performed most of the tasks they anticipated at one time or another.

Finally, arduous, demeaning, or even terrible working conditions or employment requirements alone will not suffice. These conditions may precipitate an employee's departure from an employer—such as in *Headley* or this case—but unless those conditions are used *to obtain and keep* an employee's labor, they cannot support a claim

---

alleged by plaintiffs as true and offering a "devils advocate" or an "even if" analysis to illustrate the difference between a bad employer (which may or may not include Funk Dairy) and an employer engaged in TVPRA violations.

of forced labor. *See Headley,* 687 F.3d at 780.

It does appear that working at Funk Dairy was not as enjoyable as Plaintiffs originally thought. It also appears that some aspects of the job were over-emphasized. But these facts alone do not give rise to legal action. In like manner, while it appears that Funk Dairy—mostly via Giles and other supervisory employees—was tough on Plaintiffs, somewhat overbearing, controlling, and even downright insensitive at times, being tough, rude, or even abusive does not rise to the level of forced labor under the TVPRA unless those things *induced Plaintiffs to stay.* Plaintiffs have failed to present material evidence that Funk Dairy knowingly obtained Plaintiffs' labor by force, serious harm, or threat and that they kept Plaintiffs employed via similar means. Accordingly, summary judgment in favor of Defendants is appropriate on this claim.

B. Trafficking into servitude

Plaintiffs next contend that Funk Dairy violated the trafficking into servitude provision of the TVPRA which provides that:

> (a) Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. . . ..
> (b) Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be subject to the penalties under subsection (a).

18 U.S.C. § 1590. As a threshold matter, a § 1590 claim depends on a predicate TVPRA offense—such as forced labor. *Lagayan v. Oden*, 199 F. Supp. 3d 21, 29 (D.C. Dist. 2016). As explained supra, Defendants did not knowingly obtain Plaintiffs' labor in violation of § 1589. Thus, in light of the Court's finding relative to Plaintiffs' forced

labor claim, Defendants are likewise entitled to summary judgment on Plaintiffs' trafficking into servitude claim.

Independent of this basis, the Court wishes to briefly address the merits of Plaintiffs' allegations—as it forms the basis for all remaining state and federal claims— that Funk Dairy "knowingly recruited, harbored, transported, provided, and obtained Plaintiffs to provide general dairy labor and services to the Defendants, through fraud, deceit, and misrepresentation, knowing that Plaintiffs, who are professionals, would not knowingly agree to work as general laborers for a dairy." Dkt. 24, at 20.

The essence of this claim is that Funk Dairy did not hold up its end of the bargain. As with their forced labor claim, Plaintiffs allege that Defendants were involved in a nefarious and fraudulent scheme to entice skilled laborers to come work for them, but pay them cheap wages and overwork them. Plaintiffs claim that the terms of the agreement (when they agreed to them in Mexico) were more favorable than what they encountered once they arrived in Idaho. *It is critical to note, however, that the terms of this "contract" were never reduced to writing.* Giles went to Mexico, met with Plaintiffs, discussed "terms" of employment, each accepted, and each moved to Idaho to work.

Plaintiffs' general understanding of the terms of the agreement were as follows:

- They would perform animal scientist work, including—but not limited to— colostrum handling, feed preparation and evaluation, checking cows for pregnancy, measuring serum protein in blood cells of calves, performing essential sanitation, performing artificial insemination, treating pregnant cows, applying vaccinations, handling cows, fresh cow monitoring, fresh cow milking, assisting

with administering medicine, assisting with administering treatment, performing

hoof treatments, and transferring antibodies in calf blood.

- They would receive a minimum wage of $10 per hour, work approximately 10-12

  hours per day, and have opportunities for wage increases based on performance.

- After one year of service, they would receive a $2,000 bonus, six days paid

  vacation days, and Funk Dairy would fly them back to Mexico to visit family.

- Funk Dairy would help them with travel costs as well as housing and

  transportation when they arrived in Idaho.

Although the above was not reduced to writing, Funk Dairy provided a letter—

signed by Giles—to the U.S. Department of State in support of each Plaintiffs' visa

application. This letter stated that each Plaintiff would be employed as an "Animal

Scientist for a three-year period commencing in January 2016 at an annual salary of at

least $25,000" and listed various job responsibilities and other relevant information. Dkt.

35-16, at 9. This three-year period seems to reflect the ability of the NAFTA TN Visa to

be renewed for three consecutive years. Plaintiffs contend that this was a three-year

contract whereas Funk Dairy claims that this was simply a generic explanation of the TN

visa process and not a binding contract.

Although Plaintiffs contend that they were not treated as animal scientists, each

admits that he or she performed some (but not all) of the "animal scientist" tasks outlined

above. Dkt. 43-3. Some performed artificial insemination; others did not. Some helped

with calving, others did not. *Id.* For each expected "veterinarian-level" task, at least one

Plaintiff claims to have performed it while working for Defendants, but all collectively

contend that the vast majority of their time was spent doing menial tasks such as shoveling manure, milking cows, and cleaning equipment—not true animal scientist work.

As to the promised employment benefits, each similarly claim to have received some (but not all) of the benefits that were discussed. Dkt. 43-1. Many of the Plaintiffs, but not all, received the $2,000 bonus; many of the Plaintiffs, but not all, got six days paid vacation; many of the Plaintiffs, but not all, got raises based on their performance. *Id.* Some Plaintiffs had living conditions provided for a time, some had help with travel and costs, and the list goes on. To be sure, it does appear that there were disappointments, confusion, or even unfulfilled promises; however, the Court cannot find as a matter of law that Funk Dairy *knowingly* recruited (i.e. trafficked into servitude) Plaintiffs in violation of the TVPRA and scammed them out of certain duties or promised benefits.

In conclusion, the Court has weighed all of the facts and—even accepting Plaintiffs' version as true (as is the Court's duty at summary judgment)—the testimony and evidence does not amount to either forced labor or trafficking under the TVPRA. At the least, the issues raised are disagreements about job duties, employment obligations, or expectations, and at the very most they are employment, contract, or discrimination claims,[7] but none of the testimony rises to the level of federal trafficking or forced labor.

_____

[7] Said differently, there are clearly disagreements in this case—potentially even material disputes— concerning whether or not Defendants fulfilled their promises in regard to work duties, working conditions, or job compensation; however, none of these arguments are relevant to the claims of forced (Continued)

C.  State Law Claims

In addition to their dual TVPRA claims, Plaintiffs allege six state law claims against Funk Dairy. Plaintiffs' first three state law claims sound in fraud: intentional fraud, concealment, and false promise. Plaintiffs' remaining claims (negligent misrepresentation, breach of contract, and breach of covenant of good faith and fair dealing) are contract or tort claims. While there appears to be some problems with Plaintiffs' pleading of these claims (insofar as what may or may not be pleaded under Idaho law) the Court will not weigh in on these issues at this time as it does not have jurisdiction to do so.

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). *See also* 28 U.S.C. § 1367(c) ("The district court may decline to exercise supplemental jurisdiction over a claim [] if— (3) the district court has dismissed all claims over which it has original jurisdiction."). It is appropriate for the Court to "raise the question of subject matter jurisdiction, *sua sponte*, at any time during the pendency of the action." *Snell v. Cleveland, Inc.*, 316 F.3d 822, 826 (9th Cir. 2002). In their Complaint, Plaintiffs asserted that this Court had federal question and supplement jurisdiction over all claims pursuant to 28 U.S.C. § 1331 and § 1367. Dkt. 24, at 3. After granting summary judgment on Plaintiffs' federal claims, this

---

labor or trafficking (or if they are related, it is only secondary). The question at issue in these federal TVPRA claims is whether Defendants knowingly obtained and kept Plaintiffs employed through illegal means. The Court does not find sufficient evidence (and no dispute as to any evidence) to support such a finding.

Court no longer has federal question jurisdiction, and, in turn, supplemental jurisdiction over any state law claims dissolves.

"With respect to supplemental jurisdiction in particular, a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise. A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc*., 556 U.S. 635, 639 (2009) (internal citations omitted); *accord Lacey v. Maricopa Cty*., 693 F.3d 896, 940 (9th Cir. 2012). *See also Fichman v. Media Ctr*., 512 F.3d 1157, 1162–63 (9th Cir. 2008) ("Having granted judgment on the federal claims, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the state claims."); *McCoy v. Kretschmar*, 890 F.2d 420 (9th Cir. 1989) ("The district court did not abuse its discretion in declining to exercise pendent jurisdiction over the state law claims since the federal claims were dismissed by summary judgment."). When state law claims are dismissed for lack of jurisdiction, dismissal should be without prejudice. *See Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994) (stating that dismissal after declining supplemental jurisdiction should be without prejudice).

In its discretion, the Court declines to retain jurisdiction over Plaintiffs' remaining state law claims. The best forum for Plaintiffs' state law fraud, contract, and tort claims— including the important questions of whether Giles' letter is a contract and/or satisfies the statute of frauds, the measure of damages under Idaho Code, and other nuanced issues—

MEMORANDUM DECISION AND ORDER - 26

is in Idaho State Court. Therefore, the Court will dismiss Plaintiffs' state law claims without prejudice.

      D. Defendants at issue

Finally, Funk Dairy contends that it is the only true defendant in this case and that all others must be dismissed. Again, this is a small ancillary argument, but Funk Dairy claims that Plaintiffs improperly included everyone in this lawsuit and are piercing the corporate veil by including the Funks and Curtis Giles. They correctly note that Plaintiffs were always employed by Funk Dairy and that the other named defendants (even though principles or possibly agents) have no legal connection to Plaintiffs nor have Plaintiffs alleged any agent liability in this case.

Plaintiffs counter that each of the named defendants are so intertwined there is no meaningful difference. Plaintiffs claim that in a small family run business there is no reason or need to distinguish between the principals and the corporation, particularly when the individuals in this case have all been involved in the scheme all along.

The Court does not have any documents before it outlining the legal and/or business relationships of the Defendants.

Absent a lengthy discussion regarding agency, corporate liability, piercing the corporate veil, and LLC structure, the Court simply notes that Plaintiffs admit they only worked for Funk Dairy during the relevant timeframe and simply argue that it would be unequitable to excuse Curtis Giles, David Funk, and Shoesole Farms from liability when all are so inextricable intertwined. Dkt. 38, at 26-27.

This admission lends credence to Defendants arguments, however, there is insufficient evidence to make a conclusive ruling at this time. More importantly, the Court need not reach a formal decision on this matter as it has determined that summary judgment is appropriate on Plaintiffs' federal claims as to all Defendants, and that it lacks jurisdiction over Plaintiffs' remaining state law claims.

## V. CONCLUSION

The allegations in Plaintiffs' Complaint do not rise to the level necessary to support TVPRA claims and Plaintiffs have not presented any material facts to suggest otherwise. The Court will GRANT Defendants' Motion for Summary Judgment on these claims. Defendants' Motion to Exclude the testimony of Medige is, therefore, MOOT.

By granting summary judgment on Plaintiffs' federal claims, the Court only has pendant—or supplemental—jurisdiction over Plaintiffs' remaining state law claims. In its discretion, the Court declines to exercise this jurisdiction. Idaho state court is the better forum for Plaintiffs' state law claims. Consequently, these claims are dismissed without prejudice.

## VI. ORDER

1.  Defendants' Motion for Summary Judgment (Dkt. 35) is GRANTED as to Plaintiffs' federal causes of action (Claims 1 and 2).

2.  Plaintiffs' state law claims (Claims 3, 4, 5, 6, 7, and 8) are DISMISSED WITHOUT PREJUDICE for lack of jurisdiction.

3.  Defendants' Motion to Strike Plaintiffs' Expert Disclosure (Dkt. 36) is DISMISSED as MOOT.

4. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: May 20, 2019

David C. Nye
Chief U.S. District Court Judge